ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No. 305739)
Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
Fax: (707) 782-4062
Email: andrew@packardlawoffices.com
         wncarlon@packardlawoffices.com

WILLIAM VERICK (State Bar No. 140972)
Klamath Environmental Law Center
1125 Sixteenth Street, Suite 204
Arcata, CA 95521
Tel. (707) 630-5061
Email: wverick@igc.org

DAVID WILLIAMS (State Bar No. 144479)
Law Offices of David Williams
1839 Ygnacio Valley Road, Suite 351
Walnut Creek, CA 94598
Tel: (510) 847 2356
Fax: (925) 332-0352
E-mail: dhwill7@gmail.com

Attorneys for Plaintiff
CALIFORNIANS FOR
ALTERNATIVES TO TOXICS

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CALIFORNIANS FOR ALTERNATIVES TO TOXICS,<br><br>      Plaintiff,<br><br>   vs.<br><br>KERNEN CONSTRUCTION CO., BEDROCK INVESTMENTS LLC, SCOTT FARLEY, and KURT KERNEN,<br><br>      Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387)** |

CALIFORNIANS FOR ALTERNATIVES TO TOXICS ("CATs"), by and through its counsel, hereby alleges:

## I.      JURISDICTION AND VENUE

1.       This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 (the "Clean Water Act", the "CWA" or "the Act") against Kernen Construction Co., Bedrock Investments LLC, Scott Farley, and Kurt Kernen ("Defendants").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1) of the Act, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  Specifically, this action arises under Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A) (citizen suit to enforce effluent standard or limitation).  The relief requested is authorized pursuant to 33 U.S.C. §1365(a) (injunctive relief), 33 U.S.C. §§ 1365(a), 1319(d) (civil penalties), and 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

2.       On or about December 20, 2019, Plaintiff provided written notice to Defendants, via certified mail, of Defendants' violations of the Act ("CWA Notice Letter"), and of their intention to file suit against Defendants, as required by the Act.  *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(1) (1991).  Plaintiff mailed a copy of the CWA Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); and the Executive Officer of the North Coast Regional Water Quality Control Board ("Regional Board"), pursuant to 40 C.F.R. § 135.2(a)(1) (1991).  A true and correct copy of CATs' CWA Notice Letter is attached hereto as Exhibit A, and is incorporated by reference.

3.       More than sixty days have passed since Plaintiff served this CWA Notice Letter on Defendants and the agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this Complaint.  This action's

claims for civil penalties are not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4. Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this District. Venue is also proper under 28 U.S.C. § 1391(b) because Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Intra-district venue is proper in San Francisco, California, because the sources of the violations are located within Humboldt County, California.

## II.   **INTRODUCTION**

5. This Complaint seeks relief for Defendants' violations of the CWA at the approximately 37-acre facility owned and/or operated by Defendants (the "Facility"). The Facility is located at 2350 Glendale Drive, in McKinleyville, California. Defendants discharge pollutant-contaminated storm water from the Facility into Hall Creek which drains into Mad River. Defendants are violating both the substantive and procedural requirements of the CWA.

6. Defendants' discharges of pollutant-contaminated storm water from the Facility violate the Act and the State of California's General Industrial Permit for storm water discharges, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ, and Water Quality Order No. 2014-0057-DWQ, National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 (hereinafter "General Permit" or "Permit"). Defendants' violations of the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

7. The failure on the part of industrial facility operators such as Defendants to comply with the General Permit is recognized as a significant cause of the continuing decline in water quality of receiving waters, such as Hall Creek and Mad River. The general

Complaint For Declaratory and                                                    Case No.
Injunctive Relief and Civil Penalties

3

1   consensus among regulatory agencies and water quality specialists is that storm water

2   pollution amounts to more than half the total pollution entering the marine environment each

3   year.

4   **III.    PARTIES**

5          8.      CATs is a non-profit public benefit corporation organized under the laws of

6   California, based in Arcata, California.  CATs is dedicated to the defense of the environment

7   from the effects of toxic chemicals, and the preservation and protection of the wildlife and

8   natural resources of California waters, including the waters into which Defendants discharge

9   polluted storm water.  To further its goals, CATs actively seeks federal and state agency

10  implementation of state and federal water quality laws, including the CWA, and as

11  necessary, directly initiates enforcement actions on behalf of itself and its members.

12         9.      Members of CATs, including citizens, taxpayers, property owners, and

13  residents, live, work, travel and recreate on and near Hall Creek and Mad River, into which

14  Defendants cause pollutants to be discharged.  These CATs members use and enjoy the

15  impacted waters for cultural, recreational, educational, scientific, conservation, aesthetic and

16  spiritual purposes.  Defendants' discharge of storm water containing pollutants impairs each

17  of those uses.  Thus, the interests of CATs' members have been, are being, and will continue

18  to be adversely affected by Defendants' failure to comply with the Clean Water Act and the

19  General Permit.

20         10.     Members of CATs reside in California and use and enjoy California's

21  numerous rivers for recreation and other activities.  Members of CATs use and enjoy the

22  waters of Hall Creek and Mad River, into which Defendants have caused, are causing, and

23  will continue to cause, pollutants to be discharged.  Members of CATs use these areas to

24  fish, boat, kayak, swim, bird watch, view wildlife, and engage in scientific study, including

25  monitoring activities, among other things.  Defendants' discharges of pollutants threaten or

26  impair each of those uses or contribute to such threats and impairments.  Thus, the interests

27  of CATs' members have been, are being, and will continue to be adversely affected by

28  Defendants' ongoing failure to comply with the Clean Water Act.  The relief sought herein

Complaint For Declaratory and                                          Case No.
Injunctive Relief and Civil Penalties

will redress the harms to Plaintiff caused by Defendants' activities.

11.     Plaintiff is informed and believes, and thereupon alleges that Defendants own and/or operate the Facility, and are subject to the terms of the General Permit.

12.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy or adequate remedy at law.

## IV.     LEGAL BACKGROUND

### A.     Clean Water Act

13.     Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  The CWA establishes an "interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water . . . ." 33 U.S.C. § 1251(a)(2).  To these ends, Congress developed both a water quality-based and technology-based approach to regulating discharges of pollutants from point sources into waters of the United States.

14.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from a point source into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

15.     The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).  Pollutants are defined to include, among other examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand discharged into water.  33 U.S.C. § 1362(6).

16.     A "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

17.     "Navigable waters" means "the waters of the United States." 33 U.S.C.

§ 1362(7).  Waters of the United States includes, among others things, waters that are, were, or are susceptible to use in interstate commerce, and tributaries to such waters.  40 C.F.R. § 230.3 (2015).

18.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program, 33 U.S.C. § 1342(p), and, specifically, requires an NPDES permit for storm water discharges associated with industrial activity.  *Id.* § 1342(p)(2)(B).

19.     Section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, 33 U.S.C. § 1362(5), for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. §1365(a)(1) (authorizing actions against any person alleged to be in violation of an effluent standard or limitation); *id.* § 1365(f) (defining "effluent limitation" broadly to include "a permit or condition thereof issued under [section 402] of this title," and "any unlawful act under subsection (a) of [section 301] of this title").

20.     An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day for violations occurring after January 12, 2009, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. §§ 19.1–19.4 (2008).

**B.     State Regulations**

21.     Mad River is degraded from pollutant loading.  This is officially recognized by the EPA, the State Board and the Regional Board, which have place the river on the CWA section 303(d) list of waters that are so polluted that they do not meet applicable water quality standards.  The Regional Board's Water Quality Control Plan for the North Coast Basin (hereafter referred to as the "Basin Plan") is the master policy document setting forth the legal, technical, and programmatic bases of water quality regulation in the Region. Among other things, the Basin Plan includes the water quality objectives needed to protect the designated beneficial water uses.  The Basin Plan sets forth narrative water quality objectives for sediment, settleable and suspended materials, as well as narrative objectives

Complaint For Declaratory and                                                                    Case No.
Injunctive Relief and Civil Penalties

for preventing the impairment of water quality with oil sheens, turbidity, or other nuisance conditions.  The Basin Plan also includes numeric water quality standards for pH, dissolved oxygen and toxic pollutants as well as site specific objectives for certain pollutants of concern such as lead, copper, zinc and aluminum.

22.      In addition, a rule promulgated by EPA known as the California Toxics Rule ("CTR"), discussed further below, sets Water Quality Standards ("WQS") for 126 toxic priority pollutants in California's rivers, lakes, enclosed bays, and estuaries.  The CTR applies to Hall Creek and Mad River, and includes limits for several toxic metals, including lead, copper and zinc.

**C.      California's General Industrial Storm Water Permit**

23.      Section 402 authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(b).

24.      Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

25.      The State Board elected to issue a statewide general permit for industrial discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on April 17, 1997 and again on April 1, 2014 (effective July 1, 2015), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

26.      Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent ("NOI"). The General Permit requires facilities to file their NOIs before the initiation of industrial operations.

27.      Once regulated by an NPDES permit, facilities must strictly comply with all

Complaint For Declaratory and                                                    Case No.
Injunctive Relief and Civil Penalties

of the terms and conditions of that permit.  A violation of the General Permit is a violation of the Act.  *See* General Permit, Section XXI.A.

28.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.

29.     The General Permit contains three primary and interrelated categories of requirements: 1) discharge prohibitions; 2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and 3) monitoring and reporting requirements, including the requirement to prepare an annual report.

30.     Discharge Prohibition III.B of the General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States. Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination or nuisance as defined in section 13050 of the California Water Code. Receiving Water Limitation VI.A of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards in any affected receiving water.  Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.

31.     Effluent Limitation V.A of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

32.     EPA has established Benchmark Levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT standards.  65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  The following benchmarks

Complaint For Declaratory and                                                     Case No.
Injunctive Relief and Civil Penalties

have been established for pollutants discharged by Defendants: Total Suspended Solids – 100 mg/L; Oil & Grease – 15 mg/L; Zinc – 0.117 mg/L; Chemical Oxygen Demand – 120 mg/L; Iron – 1.00 mg/L; Copper – 0.0048 mg/L; and, Aluminum – 0.75 mg/L.

33.     The Regional Board has established water quality standards for Mad River in the Basin Plan.

34.     The Basin Plan includes a toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations which are toxic to or which produce detrimental physiological responses in, human, plant, animal, or aquatic life."  III-8.01, Basin Plan.

35.     The Basin Plan provides that "[w]aters shall not contain concentrations of chemical constituents known to be deleterious to fish or wildlife."  III-3.00 Basin Plan.

36.     The Basin Plan provides that "[a]t a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs)."  *Id.*

37.     EPA issued the CTR in 2000, establishing numeric receiving water limits for certain toxic pollutants in California surface waters.  40 C.F.R. § 131.38 (2013).  The CTR establishes the following applicable numeric limit for freshwater surface waters:  zinc – 0.12 mg/L (maximum concentration), subject to water hardness.

38.     The General Permit requires dischargers to develop and implement a site-specific SWPPP.  General Permit, Section X.A.  The SWPPP must include, among other elements:  (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) an annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable.

39.     Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking

System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS their SWPPP not more than once every three (3) months in the reporting year for any non-significant revisions.  General Permit, Section X.B.

40.      Dischargers must implement the minimum BMPs identified in Section X.H.1. of the General Permit.  In addition to the minimum BMPs identified in Section X.H.1, advanced BMPs must be implemented if necessary to reduce or prevent discharges of pollutants in storm water dischargers in a manner that reflects best industry practice. General Permit, Section X.H.2.

41.      Special Conditions Section XX.B of the General Permit require a discharger to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of Receiving Water Limitations, Section VI.  The documentation must describe changes the discharger will make to its current BMPs in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  General Permit, Section XX.B.

42.      Section XV of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities within 90 days of the annual evaluation.

43.      The General Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically set forth in Section IV of the General Permit unless authorized by another NPDES permit.  General Permit, Section III. B.

44.      The General Permit requires dischargers to implement a Monitoring Implementation Plan.  General Permit, Section X.I.  As part of their monitoring plan, dischargers must identify all storm water discharge locations.  General Permit, Section X.I.2. Dischargers must then conduct monthly visual observations of each drainage area, as well as visual observations during discharge sampling events.  General Permit, Section XI.A.1 and

Complaint For Declaratory and                                                         Case No.
Injunctive Relief and Civil Penalties

2.  Dischargers must also collect and analyze storm water samples from two (2) storm events within the first half of each reporting year (July 1 to December 31) and two (2) storm events during the second half of each reporting year (January 1 to June 3).  General Permit, Section XI.B.  Section XI.B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters, and any other pollutants likely to be in the storm water discharged from the facility base on the pollutant source assessment.  General Permit, Section XI.B.6.

45.     Dischargers must submit all sampling and analytical results via SMARTS within thirty (30) days of obtaining all results for each sampling event.  Section XI.B.11. Sampling results must be compared to the two types of Numeric Action Level ("NAL") values set forth at Table 2 of the General Permit.  General Permit, Section XII.  An annual NAL exceedance occurs when the average of the results for a parameter for all samples taken within a reporting year exceeds the annual NAL value.  General Permit, Section XII.A.1.  An instantaneous NAL exceedance occurs when two (2) or more results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value.  General Permit, Section XII.A.2.  If a discharger has an NAL exceedance during a reporting year, the discharger's status changes to Level 1 status under the General Permit and the discharger must comply with the requirements set forth for Level 1 status operators set forth at Section XII.C.  The discharger's status shall change to Level 2 status if sampling results indicated an NAL exceedance for a parameter while the discharger is in Level 1 status.  If a discharger becomes Level 2 status it must comply with the obligations set forth at Section XII.D of the General Permit.

46.     Dischargers must submit an Annual Report no later than July 15th following each reporting year certifying compliance with the Permit and/or an explanation for any non-compliance.  General Permit, Section XVI.

**V.     STATEMENT OF FACTS**

47.     On August 8, 2016, CATs filed a First Amended Complaint alleging

Complaint For Declaratory and                                                   Case No.
Injunctive Relief and Civil Penalties

violations of the Clean Water Act arising from Defendants' operations at the Facility.  That case was styled *Californians for Alternatives to Toxics v. Kernen Construction Co., Bedrock Investments, LLC, Kurt Kernen, and Scott Farley*, Case No. 4:16-cv-04007-YGR ("2016 Case").

48.     On September 5, 2017, the Parties entered into a settlement agreement ("2017 Agreement") that resolved the claims brought in the 2016 Case.  The 2016 Case alleged violations at the Facility from August 8, 2011 to November 13, 2017, and the 2017 Agreement resolved only those violations occurring in that time frame.

49.     On June 17, 2019, CATs informed Defendants in writing that Defendants had violated the terms of the 2017 Agreement and requested an extension of the agreement by way of an addendum.  CATs proposed extending the term of the 2017 Agreement by one year and requiring additional injunctive and monetary terms to address the ongoing violations of the Act and the 2017 Agreement.

50.     Defendants responded on June 21, 2019 and admitted that Defendants had violated many of the terms of the Settlement Agreement and Clean Water Act raised in CATs' letter of June 17th, but did not accept or respond to CATs' proposal to extend the term of the 2017, other than to acknowledge that the request was made.

51.     On October 9, 2019, CATs again informed Defendants in writing that Defendants had violated the terms of the 2017 Agreement and renewed its request to extend the 2017 Agreement by addendum.

52.     The parties were unable to agree on an extension of the 2017 Agreement, which expired on February 1, 2020.

53.     The Facility falls under Standard Industrial Classification ("SIC") Codes 5093 ("Scrap and Waste Materials") and 142X, which includes SIC Codes 1422, 1423, and 1429 ("Crushed and Broken Limestone, Granite, and Stone").  On August 30, 2018, Defendants submitted a Notice of Information Change to the Regional Board which changed their SIC Code from 5093 to 4212 ("Local Trucking Without Storage").

54.     Industrial activities occur throughout the Facility.  CATs' investigation into

Complaint For Declaratory and                                                                 Case No.
Injunctive Relief and Civil Penalties

the industrial activities at Defendant's approximately 37-acre facility indicates that the Facility is used to manufacture and store rock aggregate products.  The Facility is also used, or has been used in the past, for storing of scrap roofing shingles, storing scrap metal, and storage for soil and organic debris.

55.     Most of these activities occur outside in areas that are exposed to storm water and storm flows due to the lack of overhead coverage, functional berms and other storm water controls.  Plaintiff is informed and believes that Defendants' storm water controls, to the extent any exist, fail to achieve BAT and BCT standards.

56.     The management practices at the Facility are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States and fail to meet BAT and BCT standards.  The Facility lacks essential structural controls such as grading, berming and roofing to prevent rainfall and storm water flows from coming into contact with these and other sources of contaminants, thereby allowing storm water to flow over and across these materials and become contaminated prior to leaving the Facility.  In addition, the Facility lacks structural controls to prevent the discharge of water once contaminated.  The Facility also lacks an adequate filtration system to treat water once it is contaminated.

57.     During rain events, storm water laden with pollutants discharges from the Facility to a small creek before discharging to Hall Creek, a tributary of Mad River, which flows to the Pacific Ocean near McKinleyville, California.

58.     Information available to Plaintiff indicates that as a result of these practices, storm water containing pollutants harmful to fish, plant and bird life, and human health are being discharged from the Facility directly to these waters during significant rain events.

59.     Information available to Plaintiff indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of significantly contaminated storm water.

60.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement an adequate Storm Water Pollution Prevention Plan at the

Complaint For Declaratory and                                                    Case No.
Injunctive Relief and Civil Penalties

Facility.

61.     Information available to Plaintiff indicates the continued existence of unlawful storm water discharges at the Facility.

62.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement adequate storm water monitoring, reporting and sampling programs at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that Defendants have not sampled with adequate frequency, have not conducted visual monitoring, and have not analyzed the storm water samples collected at the Facility for the required pollutant parameters.

63.     Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### Discharges of Contaminated Storm Water From The Facility
#### in Violation of Permit Conditions and the Act
#### (Violations of 33 U.S.C. §§ 1311(a), 1342)

64.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

65.     Receiving Water Limitations VI.A and VI.B of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water.  Discharge Prohibition III.C of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.

66.     Plaintiff is informed and believes, and thereupon alleges, that since at least November 14, 2017, Defendants have been discharging polluted storm water from the Facility into Hall Creek, which drains to Mad River and ultimately the Pacific Ocean, in violation of the General Permit.

67.     During every significant rain event, storm water flowing over and through

materials at the Facility becomes contaminated with pollutants, flowing untreated from the Facility into Hall Creek, which ultimately drains to Mad River.

68.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of waters of the United States in violation of Discharge Prohibition III.C of the General Permit.

69.     Plaintiff is informed and believes, and thereupon allege, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations VI.A and VI.B of the General Permit.

70.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are contributing to the violation of the applicable water quality standards in the Statewide Water Quality Control Plan, the applicable Regional Board's Basin Plan, and/or the CTR, in violation of Receiving Water Limitation VI.A of the General Permit.

71.     Plaintiff is informed and believes, and thereupon alleges, that every day since November 14, 2017, Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit.  These violations are ongoing and continuous.

72.     Every day Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since November 14, 2017.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

**SECOND CLAIM FOR RELIEF**
**Failure to Develop and Implement an Adequate**
**Storm Water Pollution Prevention Plan For the Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

73.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

74.     Section X of the General Permit require dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP prior to

Complaint For Declaratory and                                                                                    Case No.
Injunctive Relief and Civil Penalties

commencement of industrial activities.

75.     Defendants have failed to develop and implement an adequate SWPPP for the Facility.  Defendants' ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendants' outdoor storage of industrial materials without appropriate best management practices; the continued exposure of significant quantities of industrial materials to storm water flows; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values and other applicable water quality standards.

76.     Defendants have further failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring as required by the General Permit. General Permit, Sections X.B.1 and X.C.1.b.  Defendants continue to be in violation of the Act each day that they fail to develop and fully implement an adequate SWPPP for the Facility.  These violations are ongoing and continuous.

77.     Each day that Defendants have failed to develop and implement an adequate SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since November 14, 2017.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

**THIRD CLAIM FOR RELIEF**
**Failure to Develop and Implement the Best Available**
**And Best Conventional Treatment Technologies at the Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

78.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

79.     The General Permit's SWPPP requirements and Effluent Limitation D.32 require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

80.     Defendants have failed to implement BAT and BCT at the Facility for their discharges of TSS, zinc, aluminum, iron, copper, and COD in violation of Effluent Limitation D.32 of the General Permit.

81.     Each day that Defendants have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

82.     Defendants continue to be in violation of the BAT and BCT requirements each day that it fails to develop and fully implement BMPs meeting the BAT and BCT standards. These violations are ongoing and continuous.

83.     Defendants have been in violation of the BAT and BCT requirements at the Facility every day since at least November 14, 2017.  Defendants are subject to civil penalties for each and every violation of the Act since November 14, 2017.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

## FOURTH CLAIM FOR RELIEF
### Failure to Develop and Implement an Adequate Monitoring Implementation Plan for the Facility
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

84.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

85.     Section X.I and Section XI.A-D of the General Permit require dischargers of storm water associated with industrial activity to develop and implement a monitoring implementation plan (including, among other things, sampling and analysis of discharges) prior to commencement of industrial activities.

86.     Defendants have failed to develop and implement an adequate monitoring implementation plan for the Facility.  Defendants' ongoing failures to develop and implement adequate monitoring and reporting programs are evidenced by, *inter alia*, their continuing failure to collect and analyze storm water samples from all discharge locations, their continuing failure to analyze storm water samples for pollutants likely to be present in the

Facility's storm water discharges in significant quantities and other pollutants, including Total

Suspended Solids – 100 mg/L, Oil & Grease – 15 mg/L, Lead – 0.262 mg/L, Copper – 0.0048

mg/L, Aluminum – 0.75 mg/L, Zinc – 0.117 mg/L, and Chemical Oxygen Demand – 120

mg/L, as the General Permit requires, and its failure to file required Annual Reports with the

Regional Board which provide required documentation and information relating to visual

observations and storm water sampling and analysis conducted at the Facility.

87.     Defendants have failed to develop and implement an adequate monitoring

and reporting program for the Facility every day since at least November 14, 2017.  These

violations are ongoing and continuous.

88.      Each day of violation of the General Permit is a separate and distinct

violation of Section 301(a) of the Act, 33 U.S.C. §1311(a).  Defendants are subject to civil

penalties for each and every violation of the Act since November 14, 2017.  *See* 33 U.S.C.

§§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

### FIFTH CLAIM FOR RELIEF

**Failure to Complete Required Exceedance Response Actions**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

89.     Plaintiff incorporates the allegations contained in the above paragraphs as

though fully set forth herein.

90.     Section XII.A of the General Permit requires dischargers to compare the

results of their sampling to the two types of Numeric Action Level ("NAL") values in Table

2 of the General Permit to determine, for each applicable parameter, whether either type of

NAL has been exceeded.  If sampling results indicate that an NAL is exceeded, the

discharger enters "Level 1 status" for that parameter.  Id. § XII.C.

91.     By October 1 following the commencement of Level 1 status for any

parameter, the discharger shall complete an evaluation, with the assistance of a Qualified

Industrial Storm Water Practitioner ("QISP"), of the industrial pollutant sources at the

facility that are or may be related to the NAL exceedance(s) and identify in the evaluation

the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances.  Id. § XII.C.1.

92.     Based on this evaluation, the discharger shall, no later than January 1 following the commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation; certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report, prepared by a QISP, that includes a summary of the evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL; and, certify and submit via SMARTS the QISP's identification number, name, and contact information.  Id. § C.2.

93.     Defendants commenced Level 1 status for Total Suspended Solids, Chemical Oxygen Demand, Aluminum, and Iron on July 1, 2016 (the first year of the current permitting scheme).

94.     On July 1, 2017, Defendants commenced Level 1 status for pH and Zinc, and Level 2 status for Total Suspended Solids, Chemical Oxygen Demand, Aluminum, and Iron.

95.     On October 1, 2017, Defendants were required to complete an ERA Level 1 Evaluation for pH and Zinc.

96.     On January 1, 2018, Defendants were required to complete an ERA Level 1 Report for pH and Zinc.

97.     Defendants failed to timely complete an ERA Level 1 Evaluation for pH and Zinc, and failed to timely complete, certify, and upload to SMARTS an ERA Level 1 Report for pH and Zinc.  Not until June 27, 2019 did Defendants upload something to SMARTS that purported to fulfill these General Permit requirements.  However, the June 27, 2019 Level 1 Reports for pH and Zinc failed to include a detailed description of the SWPPP revisions.

98.     On January 1, 2018, Defendants were required to complete ERA Level 2 Action Plans for Total Suspended Solids, Chemical Oxygen Demand, Aluminum, and Iron.

99.     On December 29, 2017, Defendants uploaded to SMARTS a document entitled "Exceedance Response Action Level 2 Evaluation and Report."  However, this document failed to identify which demonstration(s) Defendants had selected to perform, and

Complaint For Declaratory and                                                    Case No.
Injunctive Relief and Civil Penalties

19

the document failed to include a schedule and a detailed description of the tasks required to complete Defendants' selected demonstration(s) as required by Section XII.D.1 of the General Permit.  Therefore, Defendants failed to timely complete, certify, and upload to SMARTS an ERA Level 2 Action Plan for Total Suspended Solids, Chemical Oxygen Demand, Aluminum, and Iron.

100.     Not until June 27, 2019 did Defendants upload something to SMARTS to address the deficiencies noted above.  However, the June 27, 2019 ERA Level 2 Action Plan includes a schedule of the "Additional BMPs Selected for Implementation," but no schedule of the tasks required to complete the selected demonstration.  Furthermore, the schedule Defendants did include only identified dates of already-implemented BMPs (October 2017) so any exceedances since those BMPs were allegedly implemented went unaddressed.

101.     On July 1, 2018, Defendants commenced Level 1 status for Copper, and Level 2 status for pH, and Defendants returned to baseline status for Zinc.  Defendants remained in Level 2 status for Total Suspended Solids, Chemical Oxygen Demand, Aluminum, and Iron for a second year.

102.     On October 1, 2018, Defendants were required to complete an ERA Level 1 Evaluation for Copper and Zinc.

103.     On January 1, 2019, Defendants were required to complete an ERA Level 1 Report for Copper and Zinc, and an ERA Level 2 Action Plan for pH.

104.     Defendants failed to timely complete an ERA Level 1 Evaluation for Copper and Zinc, and failed to timely complete, certify, and upload to SMARTS an ERA Level 1 Report for Copper and Zinc and an ERA Level 2 Action Plan for pH.

105.     On January 1, 2019, Defendants were required to complete, certify, and upload to SMARTS an ERA Level 2 Technical Report for Total Suspended Solids, Chemical Oxygen Demand, Aluminum, and Iron.

106.     Defendants failed to timely complete, certify, and upload to SMARTS an ERA Level 2 Technical Report for Total Suspended Solids, Chemical Oxygen Demand, Aluminum, and Iron.  Not until November 2019 did Defendants upload something to

SMARTS that purported to fulfill these General Permit requirements.  However, the November 2019 Technical Report failed to identify whether the BMPs implemented by Defendants were expected to eliminate future NAL exceedances.  The BMPs that were identified in the November 2019 Technical Report were all allegedly implemented in September of 2018, and therefore all exceedances after that date occurred in spite of Defendants' BMPs, however Defendants did not provide any description or analysis of BMPs that would reduce or eliminate the NAL exceedances.  General Permit, Section XII.D.2.a.

107.    On July 1, 2019, Defendants remained at ERA Levels they entered into on July 1, 2018, including a third year in a row for Total Suspended Solids, Chemical Oxygen Demand, Aluminum, and Iron.

108.    Each day Defendants failed to properly complete an ERA Level 1 Evaluation is a violation of the General Permit, Section XII.C.1.  Defendants have been in violation of this requirement every day since October 1, 2017.  In addition, each day Defendants failed to complete an ERA Level 1 Report is a violation of the General Permit, Section XII.C.2.  Defendants have been in violation of this requirement every day since January 2, 2018.

109.    Each day Defendants failed to properly complete an ERA Level 2 Action Plan is a violation of the General Permit, Section XII.D.1.  Defendants have been in violation of this requirement every day since January 2, 2019.  In addition, each day Defendants failed to complete an ERA Level 2 Technical Report is a violation of the General Permit, Section XII.D.2.  Defendants have been in violation of this requirement every day since January 2, 2019.

110.    Each day of violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §1311(a).  Defendant is subject to civil penalties for each and every violation of the Act since November 14, 2017.  See 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

Complaint For Declaratory and                                                                              Case No.
Injunctive Relief and Civil Penalties

## VII.   RELIEF REQUESTED

Wherefore, CATs respectfully requests that this Court grant the following relief:

a.   Declare Defendants to have violated and to be in violation of CWA section 301(a), 33 U.S.C. § 1311(a), for discharging pollutants from its the Facility in violation of a permit issued pursuant to CWA section 402, 33 U.S.C. § 1342 and for failing to comply with all substantive and procedural requirements of the General Permit and the CWA as alleged herein;

b.   Enjoin Defendants from discharging pollutants from the Facility and to the surface waters surrounding and downstream from the Facility in violation of the Act and the General Permit;

c.   Enjoin Defendants from further violating the substantive and procedural requirements of the General Permit;

d.   Order Defendants to pay civil penalties of $55,800 per day per violation for all violations occurring after November 14, 2017, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1–19.4 (2008);

e.   Order Defendants to take appropriate actions to restore the quality of navigable waters impaired by their activities;

f.   Award Plaintiff's costs and fees (including reasonable attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

g.   Award any such other and further relief as this Court may deem appropriate.

Dated: February 21, 2020                    Respectfully Submitted,

LAW OFFICES OF ANDREW L. PACKARD

By:   /s/ Andrew L. Packard

Andrew L. Packard
Attorneys for Plaintiff
CALIFORNIANS FOR
ALTERNATIVES TO TOXICS