LAW OFFICES OF
ANDREW L. PACKARD
245 KENTUCKY STREET, SUITE B3, PETALUMA, CA 94952
PHONE (707) 782-4060 FAX (707) 782-4062
INFO@PACKARDLAWOFFICES.COM

December 20, 2019

**VIA CERTIFIED MAIL**

Scott Farley, Partner
Kernen Construction Co.
P.O. Box 1340
Blue Lake, CA 95525

Scott Farley, Partner
Kernen Construction Co., Glendale Yard
2350 Glendale Drive
McKinleyville, CA 95519

Sandra Eve Kernen, Agent for Service
Bedrock Investments, LLC
801 Liscom Hill Road
McKinleyville, CA 95519

**Re: NOTICE OF VIOLATIONS AND INTENT TO FILE SUIT UNDER THE FEDERAL WATER POLLUTION CONTROL ACT ("CLEAN WATER ACT") (33 U.S.C. §§ 1251 *et seq*.)**

Dear Mr. Farley and Mr. Kernen:

Californians for Alternatives to Toxics ("CATs") provides this notice of violations of the Clean Water Act ("the Act") occurring at Kernen Construction Co.'s Glendale Yard located at 2350 Glendale Drive, in McKinleyville, California (the "Facility"). This letter is being sent to you as the responsible owners, officers and/or operators of the Facility. Unless otherwise noted, Kernen Construction Co., Bedrock Investments, LLC, Mr. Farley and Mr. Kernen shall hereinafter be collectively referred to as "Kernen Construction." CATs is a non-profit association dedicated to the preservation, protection and defense of the environment, wildlife and natural resources of California waters, including the waters into which Kernen Construction discharges polluted storm water.

On May 13, 2016, CATs provided notice to Kernen Construction of violations of the Act and the General Permit.[1] That letter detailed allegations of violations that occurred at the Facility between May 13, 2011 and May 13, 2016. On August 30, 2017, the Parties entered into a settlement agreement (the "Settlement") which resolved those allegations, as well as violations of the Act and Proposition 65 up to November 13, 2017. During the intervening compliance monitoring period, Kernen Construction repeatedly violated the Settlement and the Act in a variety of ways. CATs has made repeated attempts to resolve the ongoing violations at the Facility without resorting to further litigation, yet Kernen Construction has not engaged in those

[1] Clean Water Act, 33 U.S.C. § 1251 *et seq*., and National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Order No. 92-12-DWQ, Order No. 97-03-DWQ, and Order 2014-0057-DWQ.

efforts in a meaningful way. This letter is intended to provide Kernen Construction, as well as the Environmental Protection Agency and the Chief Administrative Officer for the State Board, with notice of ongoing and continuous violations of the substantive and procedural requirements of the Clean Water Act 33 U.S.C. §§ 1251 *et seq* and the General Permit occurring from November 14, 2017 to the present.

On July 1, 2015 the 2015 General Permit went into effect, superseding the 1997 General Permit that was operative between 1997 and June 30, 2015. The 2015 General Permit includes many of the same fundamental requirements and implements many of the same statutory requirements as the 1997 General Permit. Violations of both the 1997 and 2015 General Permit provisions are enforceable under the law. 2015 General Permit, Finding A.6.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Kernen Construction to a penalty of up to $54,833 per day per violation for all violations occurring between November 14, 2017 and the present. In addition to civil penalties, CATs will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law. Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees, including attorneys' fees.

The Clean Water Act requires that sixty (60) days prior to the initiation of a citizen-enforcement action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen enforcer must give notice of its intent to file suit. Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the Chief Administrative Officer of the water pollution control agency for the State in which the violations occur. *See* 40 C.F.R. § 135.2. As required by the Act, this letter provides statutory notice of the violations that have occurred, and continue to occur, at the Facility. 40 C.F.R. § 135.3(a). At the expiration of sixty (60) days from the date of this letter, CATs intends to file suit under Section 505(a) of the Act in federal court against Kernen Construction for violations of the Clean Water Act and the Permit.

## I. Background.

### A. The Clean Water Act.

Congress enacted the CWA in 1972 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The Act prohibits the discharge of pollutants into United States waters except as authorized by the statute. 33 U.S.C. § 1311; *San Francisco BayKeeper, Inc. v. Tosco Corp*., 309 F.3d 1153, 1156 (9th Cir. 2002). The Act is administered largely through the NPDES permit program. 33 U.S.C. § 1342. In 1987, the Act was amended to establish a framework for regulating storm water discharges through the NPDES system. Water Quality Act of 1987, Pub. L. 100-4, § 405, 101 Stat. 7, 69 (1987) (codified at 33 U.S.C. § 1342(p)); *see also Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 840-41 (9th Cir. 2003) (describing the problem of storm water runoff and summarizing the Clean Water Act's permitting scheme). The discharge of pollutants without an NPDES permit, or in

violation of a permit, is illegal. *Ecological Rights Found. v. Pacific Lumber Co*., 230 F.3d 1141, 1145 (9th Cir. 2000).

Much of the responsibility for administering the NPDES permitting system has been delegated to the states. *See* 33 U.S.C. § 1342(b); *see also* Cal. Water Code § 13370 (expressing California's intent to implement its own NPDES permit program). The CWA authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(b). Pursuant to Section 402 of the Act, the Administrator of EPA has authorized California's State Board to issue individual and general NPDES permits in California. 33 U.S.C. § 1342

**B. California's General Permit for Storm Water Discharges Associated with Industrial Activities**

Between 1997 and June 30, 2015, the General Permit in effect was Order No. 97-03-DWQ, which CATs refers to as the "1997 General Permit." On July 1, 2015, pursuant to Order No. 2015-0057-DWQ the General Permit was reissued, including many of the same fundamental terms as the prior permit. For purposes of this notice letter, CATs refers to the reissued permit as the "2015 General Permit." The 2015 General Permit rescinded in whole the 1997 General Permit, except for the expired permit's requirement that annual reports be submitted by July 1, 2015, and for purposes of CWA enforcement. 2015 General Permit, Finding A.6.

Facilities discharging, or having the potential to discharge, storm water associated with industrial activities that have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing a Notice of Intent to Comply ("NOI"). 2015 General Permit, Standard Condition XXI.A. Facilities must file their NOIs before the initiation of industrial operations. *Id.* Facilities must strictly comply with all of the terms and conditions of the General Permit. A violation of the General Permit is a violation of the CWA.

The General Permit contains three primary and interrelated categories of requirements: (1) discharge prohibitions, receiving water limitations and effluent limitations; (2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and, (3) self-monitoring and reporting requirements.

**C. Kernen Construction's Glendale Yard Facility**

Kernen Construction is a construction company that operates a 37-acre industrial yard in Humboldt County where it recycles concrete, asphalt, and construction and demolition debris. Industrial operations at the Facility consist of all activities required to store and manufacture rock aggregate products, including vehicle and equipment storage and repair, storage of petroleum products, and the stock piling and storage of non-toxic materials, scrap metal, soil, and organic debris. The industrial activities at the Facility fall under Standard Industrial Classification ("SIC") Code 5093 and 142X, which includes SIC Codes 1422, 1423, and 1429.

Kernen Construction collects and discharges storm water associated with industrial activities at the Facility through at least four (4) discharge points into Noisy Creek and Hall

Creek, tributaries of the Mad River, which ultimately flows into the Pacific Ocean. Noisy Creek, Hall Creek and the Mad River are waters of the United States within the meaning of the Clean Water Act.

The General Permit requires Kernen Construction to analyze storm water samples for TSS, pH, and Oil and Grease. 1997 General Permit, Section B.5.c.i; 2015 General Permit, Section XI.B.6. Facilities under SIC Code 5093 must also analyze storm water samples for Iron ("Fe"); Lead ("Pb"); Copper (Cu), Aluminum ("Al"); Zinc ("Zn"); and Chemical Oxygen Demand ("COD"). 2015 General Permit, Tables 1-2.

Lab results of storm water discharges from the Facility indicate chronic exceedances of TSS, COD, Al, Cu, Fe, and N+N, as discussed in greater detail below. However, additional pollutants are likely to be present in Kernen Construction's storm water discharges including, but not limited to, lead, pentachlorophenol, and polychlorinated biphenyls. The General Permit requires dischargers to analyze their storm water for all pollutants likely to be present. 2015 General Permit, Section XI.B.6.c.

## II. Kernen Construction's Violations of the Act and Permit.

Based on its review of available public documents, CATs is informed and believes that Kernen Construction is in ongoing violation of both the substantive and procedural requirements of the CWA and the General Permit. These violations are ongoing and continuous. Consistent with the statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, and with the terms of the Settlement, Kernen Construction is subject to penalties for violations of the Act since November 14, 2017. In addition to the violations alleged below, CATs incorporates by reference all violations detailed in its October 9, 2019 letter to Kernen Construction's counsel, attached hereto as Attachment A.

### A. Kernen Construction Discharges Storm Water Containing Pollutants in Violation of the General Permit's Discharge Prohibitions, Receiving Water Limitations and Effluent Limitations.

Kernen Construction's storm water sampling results provide conclusive evidence of Kernen Construction's failure to comply with the General Permit's discharge prohibitions, receiving water limitations and effluent limitations. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

#### 1. Applicable Water Quality Standards.

The General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance. 2015 General Permit, Discharge Prohibition III.C. The General Permit also prohibits discharges that violate any discharge prohibition contained in the applicable Regional Water Board's Basin Plan or statewide water quality control plans and policies. 2015 General Permit, Discharge

Prohibition III.D. Furthermore, storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water. 2015 General Permit, Receiving Water Limitations VI.A, VI.B.

Dischargers are also required to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of the General Permit's Receiving Water Limitations. 2015 General Permit, Special Condition XX.B. The documentation must describe changes the discharger will make to its current storm water best management practices ("BMPs") in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. *Id*.

The California Toxics Rule ("CTR") is an applicable water quality standard under the Permit, violation of which is a violation of Permit conditions. *Cal. Sportfishing Prot. Alliance v. Chico Scrap Metal, Inc.,* 2015 U.S. Dist. LEXIS 108314, *21 (E.D. Cal. 2015). CTR establishes numeric receiving water limits for toxic pollutants in California surface waters. 40 C.F.R. § 131.38. The CTR establishes the following numeric limits for pollutants discharged by Kernen Construction: Copper – 0.013 mg/L (maximum concentration) and Lead – 0.065 mg/L (maximum concentration).

The *Water Quality Control Plan for the North Coast Region (Revised May 2011)* ("Basin Plan") also sets forth water quality standards and prohibitions applicable to Kernen Construction's storm water discharges. The Basin Plan identifies present and potential beneficial uses for the Mad River, which include municipal and domestic water supply, hydropower generation, agricultural supply, industrial service supply, navigation, wildlife habitat, warm freshwater habitat, cold freshwater habitat, warm and cold spawning, and contact and non-contact water recreation.

**2. Applicable Effluent Limitations.**

Dischargers are required to reduce or prevent pollutants in their storm water discharges through implementation of best available technology economically achievable ("BAT") for toxic and nonconventional pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants. 2015 General Permit, Effluent Limitation V.A. Conventional pollutants include Total Suspended Solids, Oil & Grease, pH, Biochemical Oxygen Demand and Fecal Coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. 40 C.F.R. §§ 401.15-16.

Under the General Permit, benchmark levels established by the EPA ("EPA benchmarks") serve as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. *Santa Monica Baykeeper v. Kramer Metals,* 619 F.Supp.2d 914, 920, 923 (C.D. Cal 2009); 2015 General Permit, Exceedance Response Action XII.A.

The following EPA benchmarks have been established for pollutants discharged by Kernen Construction: Total Suspended Solids – 100 mg/L; Oil & Grease – 15.0 mg/L; Chemical Oxygen Demand – 120 mg/L; Aluminum – 0.75 mg/L; Iron – 1.00 mg/L; Zinc – 0.26 mg/L; Lead – 0.26 mg/L; Nitrate plus Nitrite Nitrogen – 0.68 mg/L; and, Copper – 0.0332 mg/L.

### 3. Kernen Construction's Storm Water Sample Results

The following discharges of pollutants from the Facility have violated the discharge prohibitions, receiving water limitations and effluent limitations of the Permit:

#### a. Discharge of Storm Water Containing Total Suspended Solids (TSS) at Concentrations in Excess of Applicable EPA Benchmark Value

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 4/11/2019 | Site 1 | TSS | 520 | 100 |
| 3/22/2019 | Site 1 | TSS | 1200 | 100 |
| 3/22/2019 | Site 3 | TSS | 220 | 100 |
| 3/5/2019 | Site 1 | TSS | 1300 | 100 |
| 12/14/2018 | Site 1 | TSS | 1200 | 100 |
| 12/14/2018 | Site 2 | TSS | 160 | 100 |
| 12/14/2018 | Site 3 | TSS | 1800 | 100 |
| 4/5/2018 | Site 1 | TSS | 970 | 100 |
| 4/5/2018 | Site 2 | TSS | 600 | 100 |
| 4/5/2018 | Site 3 | TSS | 810 | 100 |
| 1/8/2018 | Site 1 | TSS | 1100 | 100 |
| 1/8/2018 | Site 2 | TSS | 6400 | 100 |
| 1/8/2018 | Site 3 | TSS | 540 | 100 |
| 1/8/2018 | Site 1A | TSS | 230 | 100 |
| 12/20/2017 | Site 1 | TSS | 550 | 100 |
| 12/20/2017 | Site 2 | TSS | 1700 | 100 |
| 12/20/2017 | Site 3 | TSS | 1400 | 100 |
| 12/20/2017 | Site 4 | TSS | 130 | 100 |

#### b. Discharge of Storm Water Containing Zinc (Zn) at Concentrations in Excess of Applicable EPA Benchmark and CTR Values

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) | CTR Criteria (mg/L) |
|---|---|---|---|---|---|
| 1/8/2018 | Site 2 | Zn | 1.2 | 0.26 | 0.12 |

| 1/8/2018 | Site 1 | Zn | 0.46 | 0.26 | 0.12 |
|---|---|---|---|---|---|
| 12/20/2017 | Site 3 | Zn | 0.32 | 0.26 | 0.12 |

**c. Discharge of Storm Water Containing Chemical Oxygen Demand (COD) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 4/5/2018 | Site 3 | COD | 340 | 120 |
| 4/5/2018 | Site 1 | COD | 220 | 120 |
| 4/5/2018 | Site 4 | COD | 230 | 120 |
| 1/8/2018 | Site 2 | COD | 940 | 120 |
| 1/8/2018 | Site 1 | COD | 450 | 120 |
| 1/8/2018 | Site 3 | COD | 250 | 120 |
| 12/20/2017 | Site 3 | COD | 490 | 120 |
| 12/20/2017 | Site 2 | COD | 430 | 120 |
| 11/9/2017 | Site 3 | COD | 160 | 120 |

**d. Discharge of Storm Water Containing Aluminum (Al) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 4/5/2018 | Site 3 | Al | 28 | 0.75 |
| 4/5/2018 | Site 1 | Al | 1.2 | 0.75 |
| 4/5/2018 | Site 4 | Al | 1.5 | 0.75 |
| 4/5/2018 | Site 2 | Al | 39 | 0.75 |
| 4/5/2018 | Site 1A | Al | 8.8 | 0.75 |
| 1/8/2018 | Site 2 | Al | 240 | 0.75 |
| 1/8/2018 | Site 1 | Al | 62 | 0.75 |
| 1/8/2018 | Site 3 | Al | 24 | 0.75 |
| 1/8/2018 | Site 1A | Al | 12 | 0.75 |
| 1/8/2018 | Site 4 | Al | 3.7 | 0.75 |
| 12/20/2017 | Site 1 | Al | 26 | 0.75 |
| 12/20/2017 | Site 3 | Al | 46 | 0.75 |
| 12/20/2017 | Site 4 | Al | 8.3 | 0.75 |
| 12/20/2017 | Site 1A | Al | 3.5 | 0.75 |
| 12/20/2017 | Site 2 | Al | 65 | 0.75 |
| 11/9/2017 | Site 1 | Al | 18 | 0.75 |
| 11/9/2017 | Site 4 | Al | 16 | 0.75 |
| 11/9/2017 | Site 2 | Al | 7.2 | 0.75 |
| 11/9/2017 | Site 3 | Al | 38 | 0.75 |
| 1/19/12 | Site #1 | Al | 28 | 0.75 |
| 1/19/12 | Site #2 | Al | 1.2 | 0.75 |

| | | | | |
|---|---|---|---|---|
| 1/19/12 | Site #3 | Al | 1.5 | 0.75 |

**e. Discharge of Storm Water Containing Iron (Fe) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 4/5/2018 | Site 3 | Fe | 43 | 1.0 |
| 4/5/2018 | Site 1 | Fe | 1.9 | 1.0 |
| 4/5/2018 | Site 4 | Fe | 2.4 | 1.0 |
| 4/5/2018 | Site 2 | Fe | 58 | 1.0 |
| 4/5/2018 | Site 1A | Fe | 11 | 1.0 |
| 1/8/2018 | Site 2 | Fe | 500 | 1.0 |
| 1/8/2018 | Site 1 | Fe | 110 | 1.0 |
| 1/8/2018 | Site 3 | Fe | 41 | 1.0 |
| 1/8/2018 | Site 1A | Fe | 17 | 1.0 |
| 1/8/2018 | Site 4 | Fe | 5.1 | 1.0 |
| 12/20/2017 | Site 1 | Fe | 49 | 1.0 |
| 12/20/2017 | Site 3 | Fe | 110 | 1.0 |
| 12/20/2017 | Site 4 | Fe | 8.6 | 1.0 |
| 12/20/2017 | Site 1A | Fe | 4 | 1.0 |
| 12/20/2017 | Site 2 | Fe | 140 | 1.0 |
| 11/9/2017 | Site 1 | Fe | 28 | 1.0 |
| 11/9/2017 | Site 4 | Fe | 23 | 1.0 |
| 11/9/2017 | Site 2 | Fe | 6.7 | 1.0 |
| 11/9/2017 | Site 3 | Fe | 69 | 1.0 |

**f. Discharge of Storm Water Containing Copper (Cu) at Concentrations in Excess of Applicable EPA Benchmark and CTR Values**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) | CTR Criteria (mg/L) |
|---|---|---|---|---|---|
| 4/5/2018 | Site 3 | Cu | 0.04 | 0.0332 | 0.013 |
| 4/5/2018 | Site 2 | Cu | 0.058 | 0.0332 | 0.013 |
| 4/5/2018 | Site 1A | Cu | 0.043 | 0.0332 | 0.013 |
| 1/8/2018 | Site 2 | Cu | 0.43 | 0.0332 | 0.013 |
| 1/8/2018 | Site 1 | Cu | 0.1 | 0.0332 | 0.013 |
| 1/8/2018 | Site 3 | Cu | 0.041 | 0.0332 | 0.013 |
| 12/20/2017 | Site 1 | Cu | 0.043 | 0.0332 | 0.013 |
| 12/20/2017 | Site 3 | Cu | 0.085 | 0.0332 | 0.013 |
| 12/20/2017 | Site 2 | Cu | 0.11 | 0.0332 | 0.013 |
| 11/9/2017 | Site 3 | Cu | 0.063 | 0.0332 | 0.013 |

**g. Discharges of Storm Water Exceeding the Basin Plan Standards for pH**

| Date | Discharge Point | Parameter | Concentration in Discharge (pH units) | Basin Plan (pH units) |
|---|---|---|---|---|
| 4/11/2019 | Site 1 | pH | 8.6 | 6.5 – 8.5 |
| 4/11/2019 | Site 1A | pH | 9.6 | 6.5 – 8.5 |
| 4/11/2019 | Site 2 | pH | 8.7 | 6.5 – 8.5 |
| 3/22/2019 | Site 1 | pH | 8.8 | 6.5 – 8.5 |
| 3/5/2019 | Site 1A | pH | 9 | 6.5 – 8.5 |
| 3/5/2019 | Site 3 | pH | 8.6 | 6.5 – 8.5 |
| 12/14/2018 | Site 1 | pH | 8.8 | 6.5 – 8.5 |
| 4/5/2018 | Site 2 | pH | 8.7 | 6.5 – 8.5 |
| 4/5/2018 | Site 1A | pH | 10.3 | 6.5 – 8.5 |
| 1/8/2018 | Site 2 | pH | 9.1 | 6.5 – 8.5 |
| 1/8/2018 | Site 3 | pH | 8.6 | 6.5 – 8.5 |
| 1/8/2018 | Site 1A | pH | 10.1 | 6.5 – 8.5 |
| 12/20/2017 | Site 3 | pH | 8.8 | 6.5 – 8.5 |
| 12/20/2017 | Site 1A | pH | 11.3 | 6.5 – 8.5 |
| 12/20/2017 | Site 2 | pH | 9.6 | 6.5 – 8.5 |

**h. Discharge of Storm Water Containing Nitrate plus Nitrite Nitrogen (“N+N”) at Concentrations in Excess of Applicable EPA Benchmark Values**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 1/8/2018 | Site 2 | N+N | 1.91 | 0.68 |
| 12/20/2017 | Site 3 | N+N | 1.363 | 0.68 |
| 12/20/2017 | Site 2 | N+N | 3.04 | 0.68 |
| 11/9/2017 | Site 3 | N+N | 1.871 | 0.68 |

**i. Kernen Construction's Sample Results Are Evidence of Violations of the General Permit**

Kernen Construction’s sample results demonstrate violations of the Permit’s discharge prohibitions, receiving water limitations and effluent limitations set forth above. CATs is informed and believes that Kernen Construction has known that its storm water contains pollutants at levels exceeding General Permit standards since at least November 14, 2017.

CATs alleges that such violations occur each time storm water discharges from the Facility. Attachment B hereto, sets forth the specific rain dates on which CATs alleges that Kernen Construction has discharged storm water containing impermissible levels of TSS, COD,

Al, Fe, Zn, Cu, pH, and N+N in violation of the General Permit. 2015 General Permit, Discharge Prohibitions III.C and III.D, Receiving Water Limitations VI.A, VI.B.

### 4. Kernen Construction Has Failed to Implement BAT and BCT

Dischargers must implement BMPs that fulfill the BAT/BCT requirements of the CWA and the General Permit to reduce or prevent discharges of pollutants in their storm water discharges. 2015 General Permit, Effluent Limitation V.A. To meet the BAT/BCT standard, dischargers must implement minimum BMPs and any advanced BMPs set forth in the General Permit's SWPPP Requirements provisions where necessary to reduce or prevent pollutants in discharges. *See* 2015 General Permit, Sections X.H.1-2.

Kernen Construction has failed to implement the minimum BMPs required by the General Permit, including: good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping. 2015 General Permit, Section X.H.1(a-g).

Kernen Construction has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the General Permit's effluent limitations. 2015 General Permit, Sections X.H.2.

Each day that Kernen Construction have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). Kernen Construction have been in violation of the BAT and BCT requirements at the Facility every day since at least November 14, 2017.

### 5. Kernen Construction Has Failed to Implement an Adequate Monitoring Implementation Plan.

The General Permit requires dischargers to implement a Monitoring Implementation Plan. 2015 General Permit, Section X.I. As part of their monitoring plan, dischargers must identify all storm water discharge locations. 2015 General Permit, Section X.I.2. Dischargers must then conduct monthly visual observations of each drainage area, as well as visual observations during discharge sampling events. 2015 General Permit, Sections XI.A.1 and 2.

Dischargers must collect and analyze storm water samples from two (2) storm events within the first half of each reporting year (July 1 to December 31) and two (2) storm events during the second half of each reporting year (January 1 to June 3). 2015 General Permit, Section XI.B. Section XI.B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters set forth in Table 2 of the General Permit, and other pollutants likely to be in the storm water discharged from the facility based on the pollutant source

assessment. 2015 General Permit, Section XI.B.6. Dischargers must submit all sampling and analytical results via SMARTS within thirty (30) days of obtaining all results for each sampling event. 2015 General Section XI.B.11.

Kernen Construction has failed to develop and implement an adequate Monitoring Implementation Plan. These failures include using incorrect test methods to analyze samples and failing to analyze each sample for all required parameters.

Each day that Kernen Construction has failed to develop and implement an adequate Monitoring Implementation Plan is a separate and distinct violation of the Act and Permit. Kernen Construction has been in violation of the Monitoring Implementation Plan requirements every day since at least November 14, 2017.

**6. Kernen Construction Has Failed to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.**

The General Permit requires dischargers to develop and implement a site-specific SWPPP. 2015 General Permit, Section X.A. The SWPPP must include, among other elements: (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable. *See id.*

Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS for any non-significant revisions not more than once every three (3) months in the reporting year. 2015 General Permit, Section X.B.

CATs's investigation indicates that Kernen Construction has been operating with an inadequately developed or implemented SWPPP in violation of General Permit requirements. Kernen Construction has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's numerous effluent limitation violations. Each day Kernen Construction failed to develop and implement an adequate SWPPP is a violation of the General Permit. The SWPPP violations described above were at all times in violation of Section X of the 2015 General Permit. Kernen Construction has been in violation of these requirements at the Facility every day since at least November 14, 2017.

**7. Kernen Construction's November 2019 ERA Level 2 Technical Report Is Wholly Deficient**

Kernen Construction's most recent filings with the Regional Board establish that these compliance issues are likely to persist. The *Exceedance Response Action Level 2 Technical Report for Iron, Aluminum, Chemical Oxygen Demand and Total Suspended Solids* ("Technical

Report”), filed in November 2019, fails to identify any pollutant sources or activities causing Chemical Oxygen Demand exceedances, which violates Section XII.D.2.a.i of the 2015 General Permit. The Technical Report also fails to evaluate such pollutant sources, as required by Section XII.D.2.a.ii of the 2015 General Permit. Most notably, the Technical Report fails to include “an evaluation of any additional BMPs that would reduce or prevent NAL exceedances” or “the estimated costs of the additional BMPs evaluated” as required under Section XII.D.2.a.iv (1) and (2) of the 2015 General Permit..

## III. Persons Responsible for the Violations.

CATs puts Kernen Construction on notice that they are the persons and entities responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, and in Attachment B, CATs puts Kernen Construction on formal notice that it intends to include those persons in this action.

## IV. Name and Address of Noticing Parties.

The name, address and telephone number of each of the noticing parties is as follows:

Patricia Clary, Executive Director
Californians for Alternatives to Toxics
600 F Street, Suite 3 #911
Eureka, CA 95521
(707) 834-4833

## V. Counsel.

CATs has retained legal counsel to represent it in this matter. Please direct all communications to:

Andrew L. Packard
William N. Carlon
Law Offices Of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
(707) 782-4060
andrew@packardlawoffices.com
wncarlon@packardlawoffices.com

William Verick
Klamath Environmental Law Center
1125 Sixteenth Street, Suite 204
Arcata, CA 95521
(707) 630-5061
wverick@igc.org

David Williams
Klamath Environmental Law Center
1839 Ygnacio Valley Road, Suite 351
Walnut Creek, CA 94598
(510) 847-2356
davidhwilliams@earthlink.net

**VI. Conclusion**

CATs believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit. We intend to file a citizen suit under Section 505(a) of the CWA against Kernen Construction Company and their agents for the above-referenced violations upon the expiration of the 60-day notice period. If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period. We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Andrew L. Packard
Law Offices of Andrew L. Packard
Counsel for Californians for Alternatives to Toxics

**SERVICE LIST**

**VIA CERTIFIED MAIL**

Andrew Wheeler, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

Mike Stoker, Regional Administrator
U.S. Environmental Protection Agency, Region IX
75 Hawthorne Street
San Francisco, CA 94105

William Barr, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Eileen Sobeck, Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812

Matthias St. John, Executive Officer
North Coast Regional Water Quality Control Board
5550 Skylane Boulevard Suite A
Santa Rosa, CA 95403

**ATTACHMENT A**

**October 9, 2019 Letter from CATs' Counsel to Kernen Construction**

LAW OFFICES OF
ANDREW L. PACKARD
245 KENTUCKY STREET, SUITE B3, PETALUMA, CA 94952
PHONE (707) 782-4060 FAX (707) 782-4062
INFO@PACKARDLAWOFFICES.COM

October 9, 2019

Via E-Mail Only
Ms. Allison G. Jackson (ajackson@harlandlaw.com)
Mr. Paul Heagerty (pheagerty@harlandlaw.com)

Re: *Californians for Alternatives to Toxics v. Kernen Construction Co., et al;* USDC, NDCA, Case No. 4:16-CV-04007-YGR; Violations of the August 2017 Consent Agreement; Renewed Proposal to Resolve Ongoing Disputes;

Dear Allison,

On June 17, 2019, this office notified Kernen Construction Co., et al ("Kernen") that a breach of the Consent Agreement entered in August 2017 ("Settlement") had occurred and that Californians for Alternatives to Toxics ("CATs") wanted to meet and confer within seven days thereof, pursuant to Section III.15 of the Settlement. The letter details numerous sampling violations, reporting violations, and Exceedance Response Action violations, and is attached hereto as **Exhibit A** for your reference. Based upon your responsive June 21, 2019 letter, our June 20th and July 10th meet and confer calls, and the documents you have provided, this letter attempts to summarize where we continue to have disputes under the agreement, and again proposes a resolution that will avoid further litigation.

**Sampling Violations**

Under the terms of the Settlement, Kernen is required to collect and analyze samples from three qualifying storm events within the first half of each reporting year (July 1, 2017 to December 31, 2017; and, July 1, 2018 to December 31, 2018); and three qualifying events within the second half of each reporting year (January 1, 2018 to June 30, 2018; and, January 1, 2019 to June 30, 2019). Settlement, Section I.4. It is our understanding that Kernen has conceded that:

- it collected only two of the requisite three samples in the first half of the 2017-2018 reporting period; and,
- it collected only one of the requisite three samples in the first half of the 2018-2019 reporting period.

In sum, the publicly available rain data and Ms. St. John's emails confirm that there were five or more missed opportunities to collect samples in the first half of each of the past two reporting years. As a result, Kernen collected only 75% of the total samples required under the Settlement.

Under the Settlement, if Kernen is unable to collect the required six total samples from each reporting period, it is required to provide a written statement explaining its failure to collect samples, and describe additional steps that will be taken to address and eliminate future failures

to collect required samples. Settlement, Section I.6. No such statements were provided to CATs (although various explanations were offered in the course of our meet and confer calls this summer).

The Settlement also requires Kernen to analyze the samples it collects for each of the constituents listed in Exhibit D to the Settlement. Settlement, Section I.5. It is our understanding that Kernen has conceded:

- that the last three samples were not analyzed for either Polychlorinated biphenyls ("PCBs") or Pentachlorophenol ("PCP");

  *Ms. St. John has conceded that she stopped sampling for both PCB and PCP after January 2018 because "[t]he 11/9/17, 12/20/17, and 1/8/18 samples showed non detect for PCB and PCP showed up significantly below the evaluation level therefore testing was discontinued."*

  *As we have discussed, Kernen was not entitled to unilaterally discontinue sampling for these parameters unless "all three required samples [taken during the first reporting period (July 1, 2017-December 31, 2017)] are taken during QSEs and the results are 'non-detect' for PCP or for PCB." Settlement, Section I.5. Kernen has conceded that it collected only two of the requisite three samples in the first half of the 2017-2018 reporting period, therefore the exemption does not apply to either parameter. Even if it did apply, Ms. St. John's statement that "PCP showed up significantly below the evaluation level"(not specified) would not satisfy the exemption, which instead requires consecutive "non-detects."*

- that the last two samples were not analyzed for chemical oxygen demand, aluminum, copper, iron, lead, zinc, or nitrate plus nitrite nitrogen;

  *Kernen apparently elected to change its SIC code after it stopped taking Construction and Demolition debris. Leaving aside the issue of whether the SIC Code change was warranted or appropriate, communications with the Regional Board staff (which CATs was supposed to be timely copied on, to head-off this kind of confusion, but was not, in violation of the Settlement) lead Kernen to confusedly believe that they no longer had to sample for these seven pollutants – notwithstanding the clear terms of the Settlement. We do not believe Kernen's efforts to avoid testing for these parameters were made in good faith.*

Section I.5 of the Settlement also requires Kernen to provide all sample results "to CATs within ten (10) days of Defendants' receipt of the laboratory report from each sampling event." Kernen failed to timely provide *any* of the sampling results as required.

Where, as here, the discharger's sampling demonstrates chronic exceedances of the NALs, the Settlement requires Kernen to submit an Action Memoranda after the close of the wet season to identify "additional measures that will be taken to address and eliminate future exceedances and/or failures to collect required samples." Section I.6. These measures "may include, but are not limited to, further material improvements to the storm water collection and discharge system, changing the type and frequency of Facility sweeping, changing the type and

extent of storm water filtration media or modifying other industrial activities or management practices at the Facility." *Id.* As such, this settlement term is both a critical term for CATs, in furtherance of improving water quality, and an extension of the General Permit's regulatory scheme, which relies on self-monitoring to identify specific problems and mandates continuous improvement where such problems are evident. Kernen's sample results triggered Action Memorandum in both of the wet seasons to which the Settlement applies. We review each of them below.

*July 2018 Action Memorandum*. Kernen violated the Settlement by failing to provide to CATs the first action memorandum until a year after its due date, in July 2019. Had Kernen timely submitted this Action Memorandum, CATs would have been able to clarify Kernen's confusion concerning the required sampling parameters. The belated Action Memorandum details numerous and extreme NAL exceedances, establishing this facility one of the worst violators of the General Permit in all of the North Coast Region:

- NAL values were exceeded over 90 times, across eight pollutant parameters;
- Aluminum samples averaged 52.05 mg/L (*69 times the NAL*), with one sample measuring 670 mg/L (*over 893 times the NAL*);
- Iron samples averaged 111.7625 mg/L (*111 times the NAL*), with one sample measuring 1,600 mg/L (*over 160 times the NAL*)
- TSS samples averaged 1,092.25 mg/L (*10 times the NAL*), with one sample measuring at 21,000 mg/L (*over 210 times the NAL*); and,
- COD samples averaged 226.123 (*nearly twice the NAL*), with one sample measuring at 2,200 mg/L (*over* 18 *times the NAL*),

Under such circumstances, CATs would expect a thoughtful Action Memorandum setting forth robust, new BMPs to address these specific pollutants. That didn't happen. Instead, Kernen offers only the same singular, boilerplate recommendation response for all but one drainage (Sample Locations 1, 1a, 2, and 3):

> Sediment traps will be completely dug out, filtration will the replaced and all perm rock will be replaced. Oil booms will surround discharge location.

With respect to the existing traps and filtration systems, these are standard *maintenance* BMPs, for the measures already mandated under the Settlement, not targeted, new solutions. See Settlement, Section I.2.a and I.2.f. In addition, the oil booms, while potentially helpful in removing surface level debris and oils, will not meaningfully address the problems with TSS and metals demonstrated by the sampling. This violates the Settlement's substantive requirement that the Action Memorandum identify "additional measures that will be taken to address and eliminate future exceedances."

Worse yet, for Sample Location 4 -- which exceeded the NALs for Aluminum and Iron *every time they were sampled that year*, and by factors of up to more than eleven and eight times, respectively, the Action Memorandum recommends that Kernen do absolutely nothing: "It's my opinion this location remain as it as it is functioning as intended." In failing to identify any "additional measures that will be taken to address and eliminate future exceedances" at Sample Location 4, Kernen again violated the express terms of Section I.6 of the Settlement.

*July 2019 Action Memorandum*. The Settlement required that Kernen sample for COD, Aluminum, Iron, Lead, Zinc, Copper, N&N, PCBs and Penta though the last wet season -- and Kernen completely ignored this term, thereby undermining the utility of its self-monitoring program in identifying BMP deficiencies. This failure to sample for these pollutants further undermined the usefulness of the July 2019 Action Memorandum, which reviews sample results for only pH, TSS and O&G. Despite collecting only four of the required six samples for the 2018-2019 wet year, and despite failing to analyze for the nine pollutants discussed above, and even despite not bothering to take samples from Sample Location 4 for the March 22 and April 11, 2019 sampling events, the memorandum identifies eight NAL exceedances.

Instead of identifying any "additional measures that will be taken to address and eliminate future exceedances," the July 2019 memorandum simply states, in boilerplate for all five Sample Locations, that Kernen had spoken to SHN's Wetland and Stormwater Specialist, that it "will be implementing SHN's recommendations prior to October 1, 2019," and that "this report will be submitted to CATs within 10 days of receiving." CATs has not received any such report to date. In failing to actually identify the additional measures to be taken to address the exceedances, Kernen has violated the Action Memorandum requirements of the Settlement.

**Reporting Violations**

Kernen is required to provide CATs with courtesy copies of all communications to, or received from, the Regional Water Board concerning storm water discharges at the Facility. On August 30, 2018 Kernen submitted to the Regional Board a Notice of Information Change, which changed their SIC Code from 5093 (Scrap and Waste Materials) to 4212 (Local Trucking Without Storage). No courtesy copy of this notice was provided to CATs, in violation of the Settlement (giving rise to Kernen's mistaken belief that it could unilaterally change the terms of the Settlement's sampling requirements).

**Exceedance Response Actions Violations**

On July 1, 2016, Kernen entered in ERA Level 1 for total suspended solids, chemical oxygen demand, aluminum, and iron for exceedances of the numeric action levels reported in samples collected during the 2015/2016 reporting period. On September 28, 2016, Kernen completed its Level 1 ERA Evaluation for those parameters, and on December 30, 2017 submitted its Level 1 ERA Report to SMARTS as required by the General Permit.

On July 1, 2017, Kernen entered into ERA Level 1 for pH and zinc, and entered into ERA Level 2 for total suspended solids, chemical oxygen demand, aluminum, and iron. By October 1, 2017, Kernen was required to complete is Level 1 ERA Evaluation for pH and zinc; and, by January 1, 2018 complete its Level 1 ERA Report for the same. Based on the documents you have provided, and the available records on the SMARTS database, it appears that the Level 1 ERA Reports for pH and Zinc were submitted a year and half late, in June or 2019.

Also on January 1, 2018, Kernen was required to submit its Level 2 ERA Action Plan for total suspended solids, chemical oxygen demand, aluminum, and iron. Kernen submitted a deficient plan on December 29, 2017 because the plan did not satisfy the most elementary requirements of Section XII.D.1 of the General Permit, which include, *inter alia,* certification, the specification of which demonstration(s) in subsection D.2.a-c Kernen had selected to

perform, and a schedule and a detailed description of the tasks required to complete Kernen's selected demonstration(s). These deficiencies were pointed out in Mr. Carlon's June 20, 2019 letter and your June 21, 2019 letter stated that these deficiencies would "be immediately corrected."

The revised Level 2 ERA Action Plan subsequently uploaded on June 27, 2019 identifies "Additional BMPs Selected for Implementation" consisting of nothing more than the very same BMPs mandated under the Settlement, with the notation "Completed 10/2017." This date is *before* the 2017-2018 wet season and before the sampling that triggered the Level 2 ERA Action Plan in the first place and therefore does not satisfy the requirements of the General Permit.

On January 1, 2019, Kernen was required to do three things: (1) update its 2018 Level 2 ERA Action Plan to include pH and also address the ongoing exceedances of the parameters identified in the 2018 Action Plan; (2) complete its Level 2 ERA Technical Report for the parameters identified in the 2018 Action Plan; and, (3) fully implement the 2018 Action Plan. It is not clear from the SMARTS database whether any of these measures were undertaken.

**Proposals for Resolution**

CATs wishes to avoid further litigation, whether over the violations of the Settlement discussed herein, or over new violations of the Clean Water Act occurring after the November 13, 2017 dismissal of the prior action, all of which are fully actionable after February 1, 2020. To that end, CATs hereby renews its June 17, 2019 proposal that the parties file an addendum to the Settlement that would extend the term of the Settlement by a period of one year, incorporate the requisite additional injunctive terms to bring Kernen into compliance, and a mitigation payment of $100,000. As with the Settlement, the addendum would be submitted to the Department of Justice for their review and would include provisions for compliance monitoring funding, and attorney fees and costs incurred in the negotiation of the addendum.

In terms of specific additional requirements under the contemplated addendum, CATs is proposing the following measures:

(1) to address Kernen's past failure to collect the requisite samples in each of the past two fall seasons, extending the term of the Settlement by a period of one year, thereby extending the sampling, reporting and responsive action requirements of the Settlement through the current wet season and the fall of 2020 (while the term of the Settlement runs through February 1, 2020, the sampling requirements of the Settlement ended on June 30, 2019).

(2) to address Kernen's past failure to sample for all required pollutant parameters, requiring that each of the nine samples mandated for collection under (1) above be analyzed for all of the parameters set forth in **Exhibit D** of the Settlement.

(3) to address Kernen's past failure to timely submit Action Memoranda that identify "additional measures that will be taken to address and eliminate future exceedances," requiring Kernen to retain a qualified storm water professional to audit the Facility immediately (in a manner similar to the Action Memorandum) to identify "additional measures that will be taken to address and eliminate future exceedances."

These violations of the Settlement, the General Permit and the Clean Water Act have lead to chronic and gross NAL exceedances. All of these polluted discharges flow to Hall Creek and then to the Mad River, *above the public drinking water intake valves.* The North Coast Regional Water Quality Control Board has identified the Mad River on the CWA 303(d) list as an "impaired" water body with respect to sedimentation, siltation and temperature. These high concentrations of Total Suspended Solids are causing or contributing to this impairment. (40 C.F.R. §130.7(b)(4). For these reasons, time is very much of the essence. Therefore, this offer will expire two weeks from today's date, on October 23, 2019.

Thank you for your continuing courtesy and cooperation.

Sincerely,

Andrew L. Packard

cc: Patricia Clary, Executive Director, CATs

**ATTACHMENT B**

**Notice of Intent to File Suit, Kernen Construction**
**Significant Rain Events, November 14, 2017 – December 20, 2019**

November 14, 2017
November 17, 2017
November 20, 2017
November 21, 2017
November 23, 2017
November 24, 2017
November 26, 2017
November 27, 2017
November 29, 2017
December 3, 2017
December 20, 2017
January 12, 2018
January 16, 2018
January 18, 2018
January 19, 2018
January 22, 2018
January 24, 2018
January 25, 2018
January 26, 2018
January 27, 2018
February 12, 2018
February 18, 2018
February 19, 2018
February 22, 2018
February 24, 2018
February 25, 2018
February 26, 2018
March 1, 2018
March 2, 2018
March 4, 2018
March 8, 2018
March 9, 2018
April 6, 2018
April 7, 2018
April 8, 2018
April 10, 2018
April 11, 2018
April 12, 2018
April 13, 2018
April 16, 2018
April 28, 2018
May 26, 2018
June 9, 2018
September 30, 2018
October 2, 2018
November 22, 2018
November 23, 2018
November 24, 2018
November 27, 2018
November 28, 2018
November 29, 2018
November 30, 2018
December 1, 2018
December 2, 2018
December 8, 2018
December 10, 2018
December 12, 2018
December 15, 2018
December 17, 2018
December 19, 2018
December 21, 2018
December 23, 2018
December 25, 2018
December 30, 2018
January 6, 2019
January 7, 2019
January 17, 2019
January 18, 2019
January 19, 2019
January 20, 2019
January 21, 2019
February 2, 2019
February 4, 2019
February 9, 2019
February 10, 2019
February 13, 2019
February 14, 2019
February 15, 2019
February 16, 2019
February 17, 2019
February 18, 2019
February 20, 2019
February 24, 2019
February 25, 2019
February 26, 2019
February 27, 2019
February 28, 2019
March 2, 2019
March 3, 2019
March 6, 2019
March 7, 2019
March 10, 2019
March 12, 2019
March 26, 2019
March 28, 2019
March 29, 2019
April 2, 2019
April 4, 2019
April 5, 2019
April 6, 2019
April 8, 2019
April 9, 2019
April 12, 2019
April 16, 2019
May 22, 2019
May 26, 2019
August 10, 2019
August 11, 2019
September 16, 2019
September 18, 2019
September 19, 2019
September 30, 2019
October 1, 2019
October 17, 2019
October 18, 2019
October 19, 2019
November 19, 2019
November 20, 2019
November 27, 2019
November 28, 2019
December 1, 2019
December 7, 2019
December 8, 2019
December 12, 2019
December 13, 2019
December 14, 2019
December 15, 2019