IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CALIFORNIANS FOR ALTERNATIVES TO TOXICS,**<br><br>Plaintiff,<br><br>v.<br><br>**KERNEN CONSTRUCTION CO., ET AL.,**<br><br>Defendants. | CASE NO. 4:20-cv-01348 YGR<br><br>**ORDER REGARDING CIVIL PENALTIES**<br><br>Re: Dkt. Nos. 30, 31, 34, 53, 55-3 |

Plaintiff Californians for Alternatives to Toxics ("CAT") brings this action for violations of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1387 (the "Clean Water Act" or the "CWA" or "the Act") and the State of California's General Industrial Permit for storm water discharges (the "General Permit") from November 14, 2017, to the present. Defendants Kernen Construction Co., Bedrock Investments LLC, Scott Farley, and Kurt Kernen ("Defendants") have admitted liability on all claims asserted in the complaint. Now at issue are CAT's requests for civil penalties and injunctive relief.

After carefully considering the parties' submissions, and for the reasons set forth below, the Court **GRANTS** CAT's request for civil penalties in the amount of **$2,087,750**. The Court **DEFERS** its consideration of CAT's request for injunctive relief pending additional briefing.

**I.   BACKGROUND**

   **A.   Complaint**

CAT alleges as follows:

CAT is a non-profit public benefit corporation based in Arcata, California. On February 21, 2020, CAT filed the present civil enforcement action against defendants for ongoing violations

of the CWA and the General Permit that governs industrial storm water discharges in California. According to CAT, defendants continue to discharge pollutants from point sources at their facility, which is located at 2350 Glendale Drive, in McKinleyville, California ("the Facility"). The Facility is used to manufacture and store rock aggregate products. The Facility is also used, or has been used in the past, for storing of scrap roofing shingles, storing scrap metal, and storage for soil and organic debris. Most of these activities occur outside in areas that are exposed to storm water and storm flows due to the lack of overhead coverage, functional berms, and other storm water controls.

Defendants discharge storm water with excessive pollutant concentrations from the Facility into waters of the United States without applying required pollution control technologies, and such pollutant concentrations exceed water quality standards and benchmark levels established by the United States Environmental Protection Agency ("EPA") and the California State Water Resources Control Board. From November 14, 2017, to the present (the "relevant time period"), Defendants have failed to implement the required Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Defendants also continue to fail to develop and implement an adequate Storm Water Pollution Prevention Plan ("SWPPP"), and an adequate Monitoring Implementation Plan ("MIP"). Accordingly, during rain events, storm water laden with pollutants discharges from the Facility to a small creek before discharging to Hall Creek, a tributary of the Mad River, which flows to the Pacific Ocean near McKinleyville, California. Members of CAT, including citizens, taxpayers, property owners, and residents, live, work, travel, and recreate on and near Hall Creek and the Mad River, into which defendants cause pollutants to be discharged. CAT alleges that the interests of its members have been, are being, and will continue to be adversely affected by defendants' ongoing failure to comply with the CWA and the General Permit.

CAT asserts the following five claims in the complaint: (1) violations of 33 U.S.C. §§ 1311(a) and 1342 and the General Permit based on discharges of contaminated water into Hall Creek (claim 1); (2) violations of 33 U.S.C. §§ 1311 and 1342 and the General Permit based on a

2

failure to develop an adequate SWPPP for the Facility (claim 2); (3) violations of 33 U.S.C. §§ 1311 and 1342 and the General Permit based on a failure to develop and implement the BAT and BCT at the Facility (claim 3); (4) violations of 33 U.S.C. §§ 1311 and 1342 and the General Permit based on a failure to develop and implement the MIP at the Facility (claim four); and (5) violations of 33 U.S.C. §§ 1311 and 1342 and the General Permit based on a failure to complete required Exceedance Response Actions ("ERA") (claim 5).

### B.  Procedural History

On April 2, 2020, defendants filed an answer in which they admit the key allegations in the complaint. Since they filed the answer, defendants have clarified that, notwithstanding any qualifications in their answer, they admit that they are liable for all claims in the complaint as alleged therein. *See, e.g.*, ECF No. 21 at 4-11.

At a case management conference held on June 1, 2020, the parties indicated to the Court that defendants had admitted liability with respect to all claims asserted in the complaint, and that the only issues remaining to be determined in the action were CAT's request for civil penalties and injunctive relief.

In an order dated September 9, 2020, the Court ordered the parties to engage in discovery regarding the amount of civil penalties to be awarded in this case, with such discovery limited to topics relevant to the six statutory factors that a court must consider when imposing civil penalties under the CWA. Docket No. 37. In that same order, the Court stayed the action as to CAT's request for injunctive relief, which the Court indicated it would address, as necessary, following a decision on civil penalties. *Id.*

### C.  The 2016 Case

On August 8, 2016, CAT filed a First Amended Complaint in a related action captioned *Californians for Alternatives to Toxics v. Kernen Construction Co., et al.*, Case No. 4:16-cv-04007-YGR ("2016 case"). In the 2016 case, CAT brought claims against the same defendants here for violations of the CWA at the Facility from August 8, 2011, to November 13, 2017.

On September 5, 2017, the parties entered into a settlement agreement ("2017 agreement") that resolved the claims in the 2016 case, which required defendants to take certain steps to

3

1  prevent further CWA and General Permit violations. The only claims that were released pursuant
2  to the 2017 agreement were those arising out of defendants' failure to "comply with the Clean
3  Water Act or Proposition 65 at the Facility, up to the Court Approval Date." *See* Docket No. 18,
4  Ex. 2 ¶ 16. The Court approved this agreement on November 13, 2017. The Agreement
5  terminated pursuant to its own terms on February 1, 2020. *Id.* ¶ 19.

      None of the violations of the CWA and the General Permit alleged in this action took place during the time period covered by the 2016 case and the 2017 agreement.

## II.  LEGAL STANDARD

The purpose of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). "Section 301(a) of the CWA prohibits the 'discharge of any pollutant' from any 'point source' into 'navigable waters' unless the discharge complies with certain other sections of the CWA." *Nat. Res. Def. Council, Inc. v. County of Los Angeles*, 725 F.3d 1194, 1198 (9th Cir. 2013) (citing 33 U.S.C. § 1311(a)). The National Pollution Discharge Elimination System ("NPDES"), 33 U.S.C. § 1342, functions as "[a] linchpin of the CWA's regulatory scheme," authorizing "certain discharges of pollutants only if in compliance with government-issued permits, and impos[ing] related monitoring and reporting requirements." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1145 (9th Cir. 2000). An NPDES permit may take the form of a general permit, which "is issued for an entire class of hypothetical dischargers in a given geographical region and is issued pursuant to administrative rulemaking procedures." *Alaska Cmty. Action on Toxics v. Aurora Energy Servs., LLC*, 765 F.3d 1169, 1171 (9th Cir. 2014) (citations omitted).

      Industrial storm water discharges in California are subject to the General Permit. *See* State Water Resources Control Board Water Quality Order No. 91-13-DWQ, *as amended by* Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ, Water Quality Order No. 2014-0057-DWQ, and NPDES General Permit No. CAS000001. The General Permit: first, requires permittees to implement BMPs to reduce or prevent pollutants in storm water discharges; second, forbids discharges of storm water that cause or contribute to an exceedance of applicable Water Quality Standards in the applicable water quality or basin plan; third, requires permittees to

develop and implement a SWPPP; and fourth, requires permittees to develop and implement a Monitoring and Reporting Program in compliance with Section B of the Permit, which includes filing annual reports with the Regional Water Quality Control Board. *See S.F. Baykeeper v. Levin Enterprises, Inc.*, 12 F. Supp. 3d 1208, 1212 (N.D. Cal. 2013).

"[A] permittee violates the CWA when it discharges pollutants in excess of the levels specified in the permit, or where the permittee otherwise violates the permit's terms." *Nat. Res. Def. Council, Inc. v. Cty. of Los Angeles*, 725 F.3d at 1204. Because "[t]he plain language of [33 U.S.C. § 1365] authorizes citizens to enforce all permit conditions," any violation of an NPDES permit can be remedied via citizen suit. *Nw. Envtl. Advocates v. City of Portland*, 56 F.3d 979, 986 (9th Cir. 1995).

### III.  DISCUSSION

As noted, defendants' liability as to each of the five claims asserted in the complaint is undisputed, as defendants have admitted the allegations in the complaint, thereby conceding that they have violated and continue to violate the CWA and the General Permit in the manner alleged in the complaint.

CAT requests civil penalties and injunctive relief as remedies. Defendants have not opposed CAT's request for injunctive relief, but they oppose CAT's request for civil penalties. The Court turns to each of these requests, in turn.

#### A.  Civil Penalties

"Any person who violates . . . any permit condition or limitation . . . shall be subject to a civil penalty not to exceed [$56,460][1] per day for each violation." 33 U.S.C. § 1319(d). "If a district court finds a violation, then civil penalties under 33 U.S.C. § 1319(d) are mandatory." *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 1001-02 (9th Cir. 2000) (quoting *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1397 (9th Cir. 1995)). "A district court has discretion to

---

[1] Any person who violates the CWA shall be subject to civil penalties not to exceed $56,460 per day per violation occurring after November 2, 2015, where the penalties were assessed on or after December 23, 2020. <u>See</u> 40 C.F.R. § 19.4. The maximum statutory civil penalty per day, per violation under the CWA, as enacted, was $25,000. *Id.*

5

set the amount of a penalty (up to the statutory maximum) and is instructed to consider the seriousness of the violation, any economic benefit that resulted from the violation, any history of violations by the party to be penalized, that party's good-faith efforts to comply with the applicable requirements, the economic effect of the penalty on the violator, and 'such other matters as justice may require.'"[2] *Id.* (quoting 33 U.S.C. § 1319(d)).

Here, CAT requests that the Court impose $22,940,000 in civil penalties in total. CAT further requests that the Court require defendants to pay only 10% of that amount ($2,940,000) immediately and that it suspend 90% of the remaining penalty amount pending defendants' demonstration of full compliance with the General Permit by no later than October 1, 2021. *See* Docket No. 55-3 at 10. CAT arrives at the maximum penalty they seek based on the following calculations:

| Nature of violations and corresponding claim in the complaint | Number of undisputed violations during the relevant time period[3] | Penalty requested by CAT per violation | Total penalty requested by CAT |
|---|---|---|---|
| Discharge Violations (claim 1) | 11[4] | $10,000 | $110,000 |

---

[2] Courts employ a variety of methods for exercising their discretion in calculating a civil penalty under the CWA. *See, e.g., Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 573-74 (5th Cir. 1996) (applying a top-down approach wherein the court calculates the maximum penalty allowed by the CWA and then adjusts downward based on the statutory penalty factors); *United States v. Smithfield Foods, Inc.*, 191 F.3d 516, 528-29 (4th Cir. 1999) (applying a bottom-up approach wherein the court begins by calculating the economic benefit of noncompliance and then adjusts upward based on the statutory penalty factors). A district court is not required, however, to employ any of these methods in determining the amount of a civil penalty. The district court has discretion to determine the appropriate amount of a penalty so long as it considers the six statutory factors listed above and does not exceed the maximum statutory penalty amount per violation.

[3] The relevant period for the violations that the parties addressed in their briefs is from November 14, 2017, to December 3, 2020, which is the date on which the parties filed their latest briefs on penalties; this period includes 1,115 days. CAT alleges in the complaint, however, that the violations at issue are ongoing.

[4] CAT argues that these 11 violations correspond to 11 days on which defendants admitted to discharging storm water during the relevant time period, each of which counts as a violation.

| | | | |
|---|---|---|---|
| SWPPP Violations (claim 2) | 1,115[5] | $5,000 | $5,575,000 |
| Violations of Technology Standards (claim 3) | 1,115[6] | $5,000 | $5,575,000 |
| MIP Violations (claim 4) | 1,115[7] | $5,000 | $5,575,000 |
| Reporting Violations (claim 5) | 6,105[8] | $1,000 | $6,105,000 |
| **Total** | **9,461** | | **$22,940,000** |

As noted, the number of violations in question, 9,461, is based on the allegations in the complaint, which defendants have admitted. Accordingly, the number of violations at issue is undisputed.

Without citing any authority in support, defendants argue that the Court should reduce the number of undisputed violations from 9,461 to five violations total, one for each of the five claims asserted in the complaint.[9] See Docket No. 30 at 4. Defendants further argue that the Court

---

[5] CAT argues that these 1,115 violations correspond to 1,115 days on which defendants operated the Facility without an adequate SWPPP, each of which counts as a separate violation.

[6] CAT argues that these 1,115 violations correspond to 1,115 days on which defendants failed to develop and implement BAT and BCT at the Facility, each of which counts as a separate violation.

[7] CAT argues that these 1,115 violations correspond to 1,115 days on which defendants failed to develop and implement an adequate MIP, each of which counts as a separate violation.

[8] CAT argues that these 6,105 violations correspond to defendants' failure to comply with seven key deadlines over the course of 1,115 days. See Docket No. 55-3 at 4 (describing each deadline missed and the number of days/violations relating to each).

[9] In a subsequent brief, defendants argue that the Court should find that the violations asserted in connection with claim 1 are "subsumed" by claims 2 through 5 because a "discharge into Hall Creek is only a violation due to violations in the Second through Fifth Causes of Action." See Docket No. 53 at 1. The Court is not persuaded by this argument, as defendants cite no authority that supports it. Discharges that are made in violation of the CWA and General Permit, such as those alleged with respect to claim 1, are actionable in and of themselves. Defendants have not shown that a claim for unlawful discharges can be consolidated with other claims under the CWA on the basis that the defendant, in addition to unlawfully discharging storm water, *also* allegedly violated the CWA and General Permit in other ways, such as by, for example, failing to implement plans or technologies to prevent future unlawful discharges.

7

should set the penalties for each of the five violations at $3,000 per violation, for a total penalty of $15,000.

Defendants have not shown that the Court has discretion to reduce the number of violations as they propose. The Court is required to impose penalties for each violation established. *See Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d at 1001-02 ("If a district court finds a violation, then civil penalties under 33 U.S.C. § 1319(d) are mandatory."). As noted, the violations established here total 9,461.

Further, a district court may not combine violations into a single violation for the purpose of reducing the civil penalties. The plain text of the CWA provides that any person who violates the Act "shall be subject to a civil penalty . . . per day *for each* violation." 33 U.S.C. § 1319(d). The Ninth Circuit has interpreted this provision, in light of "the statutory language," "prior judicial interpretations of the statute," and "the general policy goal of discouraging pollution," as requiring civil penalties for "*each* violation." *See Borden Ranch P'ship v. U.S. Army Corps of Engineers*, 261 F.3d 810, 817-18 (9th Cir. 2001), *aff'd*, 537 U.S. 99 (2002) (emphasis supplied). In *Borden Ranch*, the Ninth Circuit rejected the argument that a district court can consolidate multiple violations that occurred in a single day into a single daily violation, reasoning that such a rule would "encourage individuals to stack all their violations into one 'Pollution Day' in which 'innumerable offenses could occur,'" which would be inconsistent with the language, intent, and legislative history of the CWA. *Id.* at 817. Defendants' request to consolidate 9,461 violations into five violations is more extreme than the one the Ninth Circuit rejected in *Borden Ranch*. For that reason, the Court declines to adopt defendants' proposal.

After carefully considering the parties' submissions, and based on the factors and reasons discussed below, the Court finds that an appropriate civil penalty for the 9,461 undisputed violations here would total **$2,087,750**[10] , broken down as follows:

---

[10] The maximum total penalty for 9,461 violations would be $534,168,060. The Court finds, based on the factors and reasons discussed below, that reducing the penalty to $2,087,750 would be appropriate.

8

| Nature of violations and corresponding claim in the complaint | Number of undisputed violations during the relevant time period[11] | Per-violation penalty imposed by the Court | Total penalty imposed by the Court |
|---|---|---|---|
| Discharge Violations (claim 1) | 11 | $10,000 | $110,000 |
| SWPPP Violations (claim 2) | 1,115 | $500 | $557,500 |
| Violations of Technology Standards (claim 3) | 1,115[12] | $500 | $557,500 |
| MIP Violations (claim 4) | 1,115 | $500 | $557,500 |
| Reporting Violations (claim 5) | 6,105 | $50 | $305,250 |
| **Total** | **9,461** | | **$2,087,750** |

### a. Seriousness of the Violations

Only 11 out of the 9,461 undisputed violations are for actual discharges of storm water containing pollutants. The Court finds these violations to be serious, as CAT has shown that (1) the water sampling data shows discharges of at least four toxic pollutants (lead, copper, pentachlorophenol, and zinc) that are harmful to animal and human life; and (2) the degree to which the discharges exceed EPA standards is significant. *See* ECF No. 55-3 at 4-6. In light of the *potential* negative impact that the discharges at issue could have on the health and safety of the community and wildlife, and the fact that the record lacks any evidence of *actual* harm to human health or wildlife, the Court finds that a fine of $10,000 would be appropriate for each undisputed discharge. *See Weber v. Trinity Meadows Raceway, Inc.*, No. 4:92-CV-267-Y, 1996 WL 477049,

---

[11] The relevant period for the violations that the parties addressed in their briefs is from November 14, 2017, to December 3, 2020, which is the date of filing of the parties' latest briefs on penalties, which is a period of 1,115 days. That being said, CAT alleges, and defendants have admitted, that the violations are ongoing.

[12] CAT argues that these 1,115 violations correspond to 1,115 days on which defendants failed to develop and implement BAT and BCT at the Facility, each of which counts as a separate violation.

at *18 (N.D. Tex. June 20, 1996) (holding that a penalty of $10,000 for each unlawful discharge was appropriate in the absence of evidence of actual harm to human health).

The remainder of the undisputed violations arise, not from actual unlawful discharges, but out of defendants' undisputed failure to implement plans, technologies, monitoring, and other preventative procedures and mechanisms required by the CWA and General Permit, and to comply with related reporting requirements. A violation of the CWA and General Permit accrues on each day that defendants fail to comply with these requirements. The Court finds that these violations, which *can* result in future unlawful discharges of pollutants, are less serious than *actual* discharges of pollutants, and it has lowered the penalty for each violation accordingly, to $500 per violation based on claims 2 through 4 of the complaint, and to $50 per violation based on claim five of the complaint. The Court finds that the total penalty amount for all undisputed violations relating to claims 2 through 5 appropriately reflects the seriousness of defendants' failure to comply with the CWA and General Permit's planning, technological, monitoring, and reporting requirements for 1,115 days, which is a significant period of time.

Defendants argue that the violations alleged in the complaint should not be deemed serious and the civil penalties should be reduced to a total of $15,000 because any such violations occurred notwithstanding defendants' compliance with the BMPs and BATs set pursuant to the 2017 agreement in the 2016 action. Docket No. 30 at 4-5. Defendants further argue that the violations in this case are, therefore, the result of their compliance with the 2017 agreement and CAT's demands in the 2016 action. *Id.* The Court is not persuaded. The allegations in the complaint in this action, which defendants have admitted, provide that the violations at issue in this case arose out of defendants' failure to comply with the CWA and the General Permit. Defendants do not explain how or why they would be exempted from complying with the CWA or General Permit as a result of a settlement agreement. Further, CAT disputes that defendants fully complied with the 2017 agreement.

Defendants next argue that the penalties for claim 2, which arise out of their failure to implement an adequate SWPPP since at least November 2017, should be reduced significantly because their lack of an adequate SWPPP during the relevant time period is justified by an

extension they received from the Water Board for implementing one.  Defendants represent that the Water Board allowed them to defer implementing a SWPPP until they installed "infiltration sites" as part of their efforts to become a "no discharge" facility.  An email chain attached to CAT's brief, whose authenticity defendants do not dispute, casts doubt on this representation.  That email shows that a member of the North Coast Regional Water Quality Control Board wrote to an employee of defendants on May 20, 2020, stating that, notwithstanding defendants' plans to install infiltrators, defendants are required to have an "updated" SWPPP "*at all times* in order to reflect the current condition of the facility."  *See* Docket No. 55-3, Exhibit D (emphasis added).  This email suggests that defendants' lack of an adequate SWPPP was not excused as a result of their efforts to become a "no discharge" facility.  Accordingly, the Court is not persuaded that the penalties imposed should be reduced from the amounts that the Court has determined are appropriate, above.

### b.  Economic Benefit from Non-Compliance

Courts quantify the economic benefit to a defendant from its failure to comply with the CWA "by comparing the present value of the costs of complying on time with the costs of complying late.  If the costs of complying late are less than the costs of complying as required by law, the [defendant] has enjoyed a positive economic benefit."  *See Hawaii's Thousand Friends v. City & Cty. of Honolulu*, 821 F. Supp. 1368, 1387 (D. Haw. 1993).

Here, notwithstanding the fact that the Court provided the parties with an opportunity to conduct discovery as to this factor, neither side has offered evidence that can be used to calculate or even estimate the economic benefit flowing to defendants from their non-compliance.

CAT argues that defendants enjoyed a significant economic benefit from their non-compliance because financial documents produced by defendants show that their gross company revenue, company profits, and the personal net worth of defendants Scott Farley and Kurt Kernen have increased each year since 2017, and that over the last two years, defendants have spent millions of dollars of company profits on acquiring or upgrading vehicles and equipment.  Docket No. 55-3 at 8-9.  These figures, however, do not speak how much money defendants were able to

save or gain by failing to comply with the CWA and the General Permit since the start of the relevant time period.

Defendants argue that they have received no economic benefit, because they have spent $90,000 in mitigation fee fines, $286,000 in expert and attorneys' fees, and $20,000 in mitigation monitoring fees in connection with the 2017 agreement. Docket No. 53 at 6-7. These amounts also do not indicate the amount that defendants were able to save or gain by failing to comply with the CWA and General Permit since the start of the relevant time period.

Accordingly, the Court finds that it cannot estimate, based on the record now before it, the economic benefit, if any, that defendants enjoyed from their non-compliance.

### c. History of Violations

CAT argues that defendants have a long history of failing to comply with the General Permit and CWA; that the Facility has been subject to multiple enforcement actions by citizen groups, including CAT in the 2016 action; and that the Facility has received multiple notices of non-compliance from the North Coast Regional Water Quality Control Board.

Defendants respond that the only violations in their history are those to which they have admitted in this action, and that all other purported violations to which CAT points have not been established, including those that were resolved in the 2016 case pursuant to the 2017 agreement. Docket No. 30 at 7-8.

The Court finds that it cannot infer based on the 2016 case, in which no liability was ever established or admitted[13], or based on warning letters that the Regional Board has sent to defendants, that defendants have a history of failing to comply with the CWA and the General Permit. The only *established* violations of the CWA and the General Permit by defendants of which the Court is aware based on the current record are those to which defendants have admitted in this action. The Court finds that the penalties that it imposes herein are consistent with that finding.

---

[13] The 2017 agreement states that defendants did not admit any liability by virtue of having entered into the settlement agreement. *See* Docket No. 18-2, Ex. 1 at 4.

12

### d. Good-Faith Efforts to Comply with the Act

CAT argues that defendants have not attempted to comply with the Act and General Permit in good faith because (1) they violated the terms of the 2017 agreement and refused to meet and confer to resolve such violations; (2) they stopped testing for certain pollutants despite being required to do so under the General Permit and the 2017 agreement; and (3) defendants falsely represented to the Court that they would become a "no discharge" operation in 2020.

The Court cannot find, based on the record now before it, that defendants have not tried to comply with the CWA and the General Permit in good faith on the basis that they violated the 2017 agreement in the 2016 action, or failed to meet and confer to resolve any disagreements as to their compliance with the same. The purported violations of the 2017 agreement were never raised to the Court in the 2016 action, and the Court lacks sufficient information at present to make any findings based on any such purported violations or efforts to resolve them.

The Court also cannot find that defendants have not tried to comply with the CWA and the General Permit in good faith based on the undisputed fact that they stopped testing for certain metals during the relevant time period. Defendants justify this interruption in their testing by noting that their "SIC code"[14] changed when they stopped accepting certain types of waste from their customers. Docket No. 53 at 2-3. Defendants represent that the change in their SIC code led them to believe that they were no longer required to test for the metals at issue. *Id.* The Court finds defendants' representation to be credible, because CAT attached to its brief correspondence between defendants' employee and the Regional Board, which shows that on May 23, 2020, the Regional Board informed defendants' employee that, typically, the new SIC code would be accompanied by an exemption from testing for certain metals, but that defendants needed to continue to test for the metals notwithstanding the new SIC code in light of defendants' prior exceedance of water quality standards. *See* Docket No. 55-3, Exhibit D. Defendants represent, and CAT has offered no evidence to dispute, that they resumed testing for these metals as soon as they learned that they were required to continue testing for them. Docket No. 53 at 2-3.

---

[14] SIC stands for Standard Industrial Classification Code.

Finally, the Court cannot find based on this record that defendants falsely represented to the Court that they would become a "no discharge" facility in 2020. CAT points to defendants' responses to requests for admission, dated October 29, 2020, in which defendants admit that they will *not* be claiming that the Facility is a "no discharge" facility pursuant to the "Notice of Non Applicability" ("NONA"). *See* Docket No. 55-3, Ex. A at 13. Obtaining NONA "no discharge" status from the State would exempt defendants from compliance with discharge-related provisions of the General Permit, because that status would indicate that no discharges from the Facility enter the waters of the United States. Defendants previously represented to the Court that they would become a "no discharge" facility in 2020, but they did not specify what that would actually entail, and they did not specify that it would involve obtaining NONA "no discharge" status. Based on this record, it is impossible to discern what defendants meant when they said that they were in the process of becoming a "no discharge" facility, or what they mean in their most recent brief when they say that they are in the process of becoming a "*de facto* no discharge facility." *See* Docket No. 53 at 5 (emphasis supplied). While the Court does not find that defendants have made any false representations with respect to their "no discharge" efforts, the Court finds that defendants have not been clear as to what they have achieved to date in terms of eliminating discharges from the Facility, or as to the extent to which their "no discharge" efforts impact the likelihood that unlawful discharges will emanate from the Facility in the future. The Court finds that the civil penalties it imposes herein are consistent with, and appropriate in light of, these findings.

          **e.**     **Economic Impact of the Penalty**

Defendants request that the Court impose a minimal civil penalty because the economic impact of the total penalty that CAT requests would be significant, as defendant Kernen Construction Company is a small business with less than 70 employees and defendants Kurt Kernen and Scott Farley are directly and personally responsible for paying any penalties. Docket No. 30 at 8-9; Docket No. 53 at 7-8. Defendants also argue that they have already spent a significant amount of money on "compliance" with the General Permit ($465,442.51) and on expenses "necessary to complete the process of establishing a de facto no discharge facility" (over $400,000). *Id.*

The Court finds that the civil penalties it imposes herein are appropriate in light of the record now before it, which shows that higher civil penalties would result in a significant negative impact on defendants and would impair their ability to continue to operate the Facility. The civil penalties the Court imposes also take into account the significant amounts that defendants have spent to date on achieving compliance with the CWA and the General Permit.

### f. Other Factors that Justice Requires

Defendants urge the Court to take into account the fact that CAT delayed in bringing to their attention their purported violations of the 2017 agreement.

CAT responds that it had no obligation to inform defendants of their failure to comply with the 2017 agreement, and that defendants have an ongoing duty to comply with the CWA and the General Permit regardless of whether they receive notice by a third party of possible violations.

The Court finds that the record before it lacks sufficient information to allow it to draw any conclusions as to whether the violations of the CWA and the General Permit at issue have any meaningful connection to the 2017 agreement or any purported violations thereof. Accordingly, the Court declines to consider the 2017 agreement or any actions by the parties in connection therewith as a factor in determining the civil penalties to impose here.

## B. Injunctive Relief

"[A] district court's equitable powers under the CWA are limited to enforcing standards, limitations, and orders that have been violated. . . . That enforcement authority does not allow equitable measures that are wholly unrelated to a violation of an existing standard, limitation, or order." *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d at 1000. "So long as the district court's equitable measures are reasonably calculated to 'remedy an established wrong,' they are not an abuse of discretion." *Id.* (quoting *Alaska Ctr.*, 20 F.3d at 986).

In a brief filed on July 1, 2020, CAT argues that, because defendants have admitted that they are unable to lawfully discharge storm water, the Court should enjoin them from discharging at all until they can bring the Facility into compliance, and that the Court should further order them to collect all storm water generated at the Facility and transport it for treatment and disposal at the nearby McKinleyville Wastewater Treatment Plant. Docket No. 30 at 3. CAT further

requests that, if defendants wish to discharge from their Facility in the future, the Court appoint a Special Master to oversee the process of bringing the Facility into compliance.  *Id.*  Alternatively, CAT requests that it be permitted to take discovery on the technologies and practices that would constitute the BAT and BCT and that would best meet the Facility's site-specific needs so that CAT can request an order requiring defendants to take specific actions that bring the Facility into compliance with the General Permit and CWA by a date certain.  *Id.*

In their briefs, defendants do not address CAT's request for injunctive relief.

To the extent that CAT continues to seek injunctive relief, CAT shall meet and confer with defendants forthwith (1) to determine whether the parties can reach an agreement as to appropriate injunctive relief here, and (2) to determine what discovery CAT needs to move for injunctive relief and can be obtained in the next ninety days.  The parties shall file a joint statement within thirty days of the date this order is filed indicating whether CAT intends to proceed with its request for injunctive relief, describing the results of the parties' meet-and-confer efforts, and proposing next steps.

**IV.   CONCLUSION**

For the foregoing reasons, the Court **GRANTS** CAT's request for civil penalties in the amount of **$2,087,750**.  The Court **DEFERS** ruling on CAT's request for injunctive relief pending the filing of a joint statement in thirty days.

**IT IS SO ORDERED.**

Dated: May 2, 2021

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**